ACCEPTED
03-15-00422-CV
7320560
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/9/2015 5:18:13 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00422-CV

| | | |
|---|---|---|
| SHAKEEL MUSTAFA, | § | IN THE THIRD |
| Appellant | § | |
| | § | |
| v. | § | COURT OF APPEALS |
| | § | |
| FELIX RIPPY, | § | |
| Appellee | § | AUSTIN, TEXAS |

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/9/2015 5:18:13 PM
JEFFREY D. KYLE
Clerk

## APPELLANT'S MOTION FOR EN BANC RECONSIDERATION
## AND IN THE ALTERNATIVE PETITION FOR WRIT OF MANDAMUS

Shakeel Mustafa, Appellant, asks the Court to grant this motion to reconsider the case *en banc*.

### Introduction

1. Appellant is Shakeel Mustafa. Appellee is Felix Rippy. A panel of the court issued the judgment and opinion in this case on September 24, 2015. A copy of the opinion is attached to the appendix filed herewith (Appendix, p. 85). The panel that rendered judgment in this case consisted of Chief Justice Rose, Justice Pemberton and Justice Field. The panel that rendered judgment denied Appellant's last timely filed motion for rehearing on September 24, 2015.

### Argument & Authorities

2. The Court has the authority to grant this motion and submit the case to the full court, sitting en banc.[1] The primary issue in the appeal was whether a party can

---

[1] Tex. R. App. P. 49.7; *see* Tex. R. App. P. 41.2.

Page 1

appeal the denial of a motion to compel arbitration when there are competing motions to compel arbitration with different procedural rules. Specifically, Appellant requested that arbitration be compelled pursuant to the American Arbitration Association Consumer Rules, and Appellee's motion to compel arbitration did not. The panel resolved the issue by holding it did not have jurisdiction to consider the denial of his motion to compel arbitration. Appellant is not asking this court to compel mediation (though he asked the trial court to compel mediation); rather, the issue here is whether the denial of Appellant's motion to compel arbitration can be appealed.

3. The panel's resolution of that issue is contrary to another opinion issued by the Fifth Court of Appeals in *Morford et. Al. v. Esposito Securities, LLC*, No. 05-14-01223-CV (Tex. App. – Dallas September 18, 2015). A copy of that opinion is attached herewith. (Appendix, p. 87). To resolve the conflict between the opinion in this case and the one in *Morford*, Appellant asks the Court to reconsider the case *en banc*.[2] The conflict between the cases is that the Fifth Court of Appeals held that the denial of one motion of competing motions to compel arbitration does in fact provide the appellate court with jurisdiction to consider the appeal. To the extent necessary, Appellant requests that his appeal be alternatively treated as a petition for writ of mandamus.

---

[2] *See* Tex. R. App. P. 41.2(c), 49.7

4. The issue in this case presents such an extraordinary circumstance that resolution of the issue by the Court *en banc* is necessary.[3] The importance of the protections provided by the American Arbitration Association Consumer Rules is of significant concern to Appellant and necessary for the fair and equitable resolution of the instant dispute. The arbitration agreement specifically provides that "AAA Rules" will be followed, but the arbitration is taking place outside of the AAA and without the application of the AAA Rules. (Appendix p. 13, 24). Appellant requests that this Court withdraw its opinion and allow this issue to be fully briefed because this Court does have jurisdiction to consider the denial of his motion to compel arbitration.

## IN THE ALTERNATIVE, PETITION FOR WRIT OF MANDAMUS

### Mandamus – Jurisdictional Issue.

5. Because the trial court denied Mustafa's motion to compel arbitration pursuant to the AAA Rules, this Court has jurisdiction.[4] Where two competing motions to compel arbitration exist, the denial of one grants appellate jurisdiction.[5]

---

[3] *Id.*

[4] Texas Civil Practice and Remedies Code, Sections 51.016 permitting appeals from a district court of any order that would be governed by the Federal Arbitration Act, 9 U.S.C. § 16 (§ 16(a)(1)(B) permitting immediate interlocutory appeal of any order "denying a petition under section 4 of this title to order arbitration to proceed") and Texas Civil Practice & Remedies Code § 171.098(a)(1) ("Any party may appeal a judgment or decree entered under this subchapter or an order:…(1) denying an application to compel arbitration made under Section 171.021").

[5] *See McReynolds v. Elston*, 222 S.W.3d 731 (Tex. App. Houston [14th Dist.] 2007) (finding jurisdiction because "although the trial court's order allowed the AAA Arbitration to continue, it denied McReynolds's potential contractual right to arbitration under the Settlement Agreement")

In the alternative, should this Court determine that it does not have jurisdiction, this Court should instead treat this matter as a petition for a writ of mandamus and review the issues under the mandamus standard of review.[6] This Court has jurisdiction to issue a writ of mandamus.[7]

<u>Mandamus – Introduction</u>

6. Relator, Shakeel Mustafa, submits this petition for writ of mandamus complaining of the order of the Honorable Judge Gary Harger, acting arbitrator of this matter appointed by the Honorable John McMaster, Williamson County Court at Law Number Four, Texas. For clarity, relator is referred to as Relator/Mustafa, Respondent 1, the Honorable Judge Gary Harger, is referred to by name, Respondent 2, the Honorable Judge John McMaster, is referred to by name, and the real party in interest is referred to as Felix Rippy, Rippy and Taylor, P.C.

<u>Mandamus – Statement of the Case</u>

7. Relator, Shakeel Mustafa, submits this petition for writ of mandamus complaining of the order of the Honorable Judge Gary Harger, acting arbitrator of this matter appointed by the Honorable John McMaster, Williamson County Court at Law Number Four, Texas.

---

[6] *See CMH Homes v. Perez*, 340 S.W.3d 444, 452 (Tex. 2011) (impermissible interlocutory appeal from order appointing an arbitrator would be considered as a petition for writ of mandamus, where seller invoked the court of appeals' appellate jurisdiction by specifically requesting that its appeal be treated as a mandamus petition); *Lucchese, Inc. v. Rodriguez*, 388 S.W.3d 354, 360-61 (Tex. App.– El Paso 2012, no pet.).
[7] Tex. Gov't Code §22.221(a), (b), and (c); *see* Tex. Const. art. V, §6(a).

8. Rippy filed a collection lawsuit against Mustafa, a former client of Rippy. Rippy's original petition requested Mustafa be jailed for 180 days, fined up to $500, and confined in the county jail until Mustafa paid the alleged debt. Each party submitted motions to compel arbitration, with the difference being that Mustafa requested the AAA Consumer Arbitration Rules be applied. Rippy subsequently amended his petition to allege defamation. Mustafa filed a counterclaim and third-party claim against the law firm Rippy & Taylor, P.C. alleging unreasonable collection efforts and violations of the Texas Deceptive Trade Practices Act.

9. The Honorable John McMaster granted Rippy's motion to compel arbitration and denied Mustafa's request. Mustafa's subsequent motion to stay the case pending arbitration was granted, and the Honorable Gary Harger was appointed arbitrator with authority to decide all questions of law and fact. The Honorable Gary Harger ruled that Mustafa could not issue additional discovery requests beyond the initial request for production.

10. The Respondent Honorable Judge Harger's actions, which form the basis for this petition, include the refusal to allow discovery beyond the initial request for production, refusing to allow amended pleadings and additional parties, refusal to implement the AAA Consumer Arbitration Rules, and to recuse himself due to the fact that he served as mediator in the underlying litigation where Rippy represented Mustafa in a post-divorce action and based on his ongoing relationship with Mr.

Rippy where he has been retained as mediator. The Respondent Honorable Judge John McMaster's actions, which form the basis for this petition, include denying Relator's motion to compel arbitration pursuant to Rules of the American Arbitration Association.

## Mandamus – Issues Presented

Issue 1: The arbitrator abused his discretion by not allowing Mustafa to conduct additional discovery regarding his claims, refusing to allow amended pleadings and additional parties, by not implementing the AAA Consumer Arbitration Rules and by not recusing himself due to his involvement in the underlying case as mediator, and by not recusing himself due to the fact that he served as mediator in the underlying case and his ongoing business relationship with Mr. Rippy.

Issue 2: The trial court abused his discretion by not implementing the AAA Consumer Arbitration Rules and by appointed an arbitrator who served as mediator in the underlying case where Relator disclosed confidential information.

## Mandamus – Argument and Authorities

11. Mandamus relief is appropriate to remedy a trial court's abuse of discretion where a party has no adequate remedy at law.[8] A court should consider

---

[8] *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992)

whether the benefits of mandamus review outweigh the detriments.[9]  Here, the arbitration agreement clearly provides, "Client consents . . . to all disagreements' [sic] being arbitrated pursuant to AAA arbitration rules."  Thus, it was an abuse of discretion to compel arbitration without requiring the AAA as the forum, to require the AAA arbitrator appointment rules to apply, and to appoint the Honorable Judge Harger, who served as mediator in the underlying case where Appellant disclosed confidential information.  (Appendix, p. 13, lines 1-3, 22-23).  Alternatively, assuming this Court determines it was appropriate for the trial court to defer to the arbitrator on the issue of what rules to follow, it was an abuse of discretion for the arbitrator to not apply the AAA rules (Appendix, p. 24), to not allow any amendment of pleadings or additional discovery (Appendix, p. 26), and to not recuse himself.

12.  Mandamus is an extraordinary writ that should be issued only when the trial court has clearly abused its discretion and there is no adequate remedy by appeal.[10] In this case, Mustafa has no adequate remedy and will suffer significant harm because the AAA Rules are not being followed.  Mustafa is being denied the right to conduct discovery related to his claims, has no ability to seek a ruling related to the adequacy of Rippy's response to his request for production, and no ability to seek appointment of an arbitrator that was not directly involved in the underlying

---

[9] *In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 845 (Tex. 2008) (orig. proceeding).
[10] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004); *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992)

litigation that forms the basis of this suit.

13. An appellate court has jurisdiction to issue "a writ of mandamus and all other writs necessary to enforce the jurisdiction of the court," as well as "all writs of mandamus, agreeable to the principles of law regulating those writs, against a . . . judge of a district or county court in the court of appeals district. . . ."[11] Further, this court has jurisdiction related to an attempt of apparent restraint of liberty by virtue of an order because the live petition in this cause is requesting that Relator be jailed for the failure to pay a debt.[12]

14. Appellant has no adequate remedy by appeal should this Court refuse to hear their appeal on an interlocutory basis. In determining whether a party has shown that he has no adequate remedy by appeal, the analysis is dependent upon the circumstances and is guided by principles rather than simple rules.[13] A party does not have an adequate remedy of appeal "when the appellate court would not be able to cure the trial court's discovery error."[14] There is no adequate remedy at law here because, by compelling arbitration without applying AAA Rules, the trial court has denied Appellant the benefit of the agreement to arbitrate before the AAA, and as a result he is not allowed to utilize the AAA rules regarding conflict of interest, recusal, amendment of pleadings, or adding parties. Here, the denial of the ability

---

[11] TEX. GOV'T CODE ANN. § 22.221(a), (b)(1) (Vernon 2004).
[12] TEX. GOV'T CODE ANN. § 22.221(d) (Vernon 2004).
[13] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004).
[14] *Walker*, 827 S.W.2d at 843.

to add the actual party to the contract (the professional corporation), results in a manifest injustice. "A party who is erroneously denied the right to arbitration has no adequate remedy at law because the fundamental purpose of arbitration—to provide a rapid, less expensive alternative to traditional litigation—would be defeated."[15]

15. If this Court does not reverse the trial court's decision to compel arbitration without applying the AAA Rules or the arbitrator's decision regarding same, Appellant will suffer irreparable harm by subject to an arbitration where there is no central mechanism to file pleadings. In the instant case, Appellant is required to email documents but there is no central clerk that ensures some mechanism for receipt and organization of filings. Texas law "does not require [the Court] to turn a blind eye to blatant injustice. . . . Appeal . . . is no remedy at all for the irreversible waste of judicial and public resources that would be required . . . if mandamus does not issue."[16] Further, Appellant is being the denied the right to conduct discovery, add the actual party to the arbitration agreement (the professional corporation), and otherwise defend himself properly against claims that opposition claims exceed the

---

[15] *See Prudential*, 148 S.W.3d at 138; see also In re Global Const. Co., L.L.C., 166 S.W.3d 795, 799 (Tex. App.–Houston [14th Dist.] 2005, no pet.); *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272-73 (Tex. 1992) (orig. proceeding) ("Absent mandamus relief, [Relator] would be deprived of the benefits of the arbitration clause it contracted for, and the purpose of providing a rapid, inexpensive alternative to traditional litigation would be defeated."); *In re Golden Peanut Co.*, 298 S.W.3d 629 (Tex. 2009) (orig. proceeding) *(citing In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 128 (Tex. 1999), "[a] party denied the right to arbitrate pursuant to an agreement subject to the FAA does not have an adequate remedy by appeal and is entitled to mandamus relief to correct a clear abuse of discretion").
[16] *In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (orig. proceeding).

jurisdictional limits of the court. (Appendix, page 33).

## Conclusion

16. Appellant respectfully requests that this Court recognize it has jurisdiction to consider this dispute and if necessary treat this appeal as a petition for writ of mandamus. There is a dispute between this opinion and an opinion issued six days earlier regarding the same issue of competing motions to compel arbitration.

## Prayer

17. For these reasons, Appellant asks the Court to grant this motion to reconsider the case en banc, and in the alternative request this petition for writ of mandamus be granted to require the application of the AAA Rules (including disqualification of an arbitrator), allow discovery to be conducted, and allow parties to the underlying contract at issue to be added as parties to the arbitration.

Respectfully submitted,

*/s/ Chris Osborn*
Christopher Osborn
State Bar No. 24037221

Osborn Law Firm, P.C.
1019 Cecelia St.
Taylor, TX 76574
512-275-6593
512-309-5317
chris@osbornpc.com

Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

In accordance with the Texas Rules of Appellate Procedure 9.4, the undersigned attorney of record certifies that this brief contains 14-point typeface for the body of the document, 12-point typeface for footnotes in the brief, and contains 2,405 words as indicated by the word count software, excluding those words identified as exempt from the word count under the rule and was prepared on Microsoft Word.

*/s/ Chris Osborn*
Christopher Osborn

## CERTIFICATE OF SERVICE

I certify that a copy of Appellant's Brief was served on Appellee, Felix Rippy, via electronic mail before 5:00 p.m. this 9th day of October, 2015.

*/s/ Chris Osborn*
Christopher Osborn

## CERTIFICATE OF CONFERENCE

I certify that I contacted Appellee, Felix Rippy, via electronic mail on October 2, 2015, and he is opposed to this motion.

/s/ Chris Osborn
Christopher Osborn

Cause No. 15-0708-CC4

| | | |
|---|---|---|
| FELIX RIPPY, | § | IN THE COUNTY COURT |
| Plaintiff | § | |
| | § | |
| v. | § | AT LAW NUMBER 4 |
| | § | |
| SHAKEEL MUSTAFA, | § | |
| Defendant | § | WILLIAMSON COUNTY, TEXAS |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S ASSSIGNMENT, AND
DEFENDANT'S MOTION TO COMPEL MEDIATION THEN ARBITRATION PURSUANT TO AAA
CONSUMER ARBITRATION RULES AND IN THE ALTERNATIVE MOTION TO DISMISS**

1.     Shakeel Mustafa, Defendant, asks the Court to refer the dispute between Rippy & Taylor, P.C. and Shakeel Mustafa, Individually, to alternative dispute resolution (ADR) under the authority of Texas Civil Practice & Remedies Code and pursuant to the Federal Arbitration Act.   Defendant alternatively requests that Plaintiff's petition be dismissed for failure to cure defects noted in Defendant's Special Exceptions and due to the defective purported assignment.

**INTRODUCTION**

2.     Plaintiff, Felix Rippy, Individually, filed suit against Shakeel Mustafa. The attorney-client agreement attached to Plaintiff's Original Petition is between Rippy and Taylor, P.C. and Mr. Mustafa.  After Defendant filed special exceptions objecting to the case filed on behalf of Felix Rippy, Individually, and after this Court's order allowing Plaintiff to re-plead on June 12, 2015, the style of this case remains filed on behalf of Felix Rippy, Individually.  Plaintiff failed to cure the defects, instead alleging that all claims have been assigned to him, individually.

**OBJECTION TO PURPORTED ASSIGNMENT**

3.       Defendant objects to Plaintiff's purported assignment of the underlying contract from the professional corporation to himself, individually.  The underlying contract, which is attached hereto and incorporated herein as Exhibit "1" provides in paragraph five that "[a] referral to an attorney outside the firm may require a separate contract with that attorney <u>and will not be done without Client's consent</u>." (emphasis added).   Thus, the purported assignment here is improper because the agreement specifies that if it is to be sent "outside the firm [Rippy & Taylor, P.C.]," it requires "the Client's consent."

4.       Assignments should be permitted or prohibited based on the likely effect on society, and in particular, on the legal system. Employing a public policy analysis, the majority of courts in this country have concluded that at least some claims arising out of the attorney-client relationship are not assignable. *Vinson & Elkins v. Moran*, 946 SW 2d 381 (Tex.App. Houston [14th Dist.] 1997) (analyzing malpractice claims).

**PLAINTIFF'S REQUEST FOR CONTEMPT FINDINGS SHOULD BE DISMISSED**

5.       Plaintiff mistakenly claims that the final decree of divorce between Mr. Mustafa and his ex-wife constitutes a secured judgment in the amount of $17,500 against Mr. Mustafa, individually.  However, due process requires this issue to be adjudicated before it should be treated as a violation of any court order.  The phrase relied on by Plaintiff is found in the underlying divorce decree requiring each litigant pay their own attorney's fees, but this does not equal language  that supports a finding of contempt.  The Texas Supreme Court analyzed this issue in *Ex parte Chambers*, 898 S.W.2d 257, 259 (Tex.1995): "A court order is insufficient to support a judgment of contempt only if its interpretation requires inferences or conclusions about which reasonable persons might differ." *MacCallum*, 807 S.W.2d at 730.

The existence of reasonable alternative constructions of a court order will prevent enforcement of the order. *See, e.g., Ex parte Crawford*, 684 S.W.2d 124 (Tex.App.Houston [14th Dist.] 1984, orig. proceeding) (holding an obligor in contempt who knew with certainty he was to pay one of two amounts of child support but ignored the order altogether). Here, there was no order to pay a specific amount. In fact, Defendant will testify that no invoice was ever received by him and that this suit is in retaliation for filing a grievance with the State Bar of Texas.

**PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO CURE DEFECT OF PARTIES**

6.      Plaintiff has not cured the defects noted in Plaintiff's special exceptions and there remains a defect in the parties. Plaintiff's claim should be dismissed in its entirety without prejudice.

**MOTION TO COMPEL MEDIATION THEN ARBITRATION WITH AAA CONSUMER ARBITRATION RULES**

7.      In the event the Court does not dismiss this suit, Defendant requests that the Court order that Plaintiff follow the terms of the agreement requiring mediation. Defendant requests that the Court order mediation pursuant to the agreement that provides "THE PARTIES AGREE TO MEDIATE ALL SUCH DISPUTES PRIOR TO ARBITRATION." (emphasis in original). Defendant requests the Court order mediation pursuant to Texas Civil Practice & Remedies Code section 154.023.

8.      If mediation does not resolve the dispute, Plaintiff asks this Court to order binding arbitration between Rippy and Taylor, P.C. and Defendant, following the AAA Consumer Arbitration Rules, pursuant to the Federal Arbitration Act (9 U.S.C. sec 1 et seq.) and/or pursuant to Texas Civil Practice & Remedies Code section 154.027.

9.      This case is appropriate for referral to ADR because there is a binding arbitration agreement between Defendant and Rippy and Taylor, P.C.

## ADDITIONAL SPECIAL EXCEPTIONS

10.     Defendant specially excepts to Plaintiff's claim that "Felix Rippy ... has individual claims against Shakeel Mustafa, as well" in that there is not specificity as to the basis of these purported claims that Plaintiff contends exist in addition to the contractual claims of Rippy and Taylor, P.C.  If there are indeed other facts or causes of action that will be asserted, the question of whether those claims are arbitrable will require a separate inquiry because there is no arbitration agreement between Felix Rippy, Individually, and Defendant.

## CONCLUSION

For these reasons, Defendant asks the Court to dismiss this suit or render judgment that plaintiff take nothing, assess costs and fees against plaintiff, and award all other relief to which defendant is entitled.  Defendant asks the Court to strike the defective portions of Plaintiff's pleading.  Alternatively, Defendant asks this Court to compel mediation followed by binding arbitration, if necessary, between Rippy and Taylor, P.C. and Defendant, following the AAA Consumer Arbitration Rules.

RESPECTFULLY SUBMITTED,

OSBORN LAW FIRM, P.C.

By: */s Chris Osborn*
Christopher D. Osborn
State Bar No. 24037221
1019 Cecelia Street
Taylor, Texas 76574
512-275-6593
512-309-5317 fax
chris@osbornpc.com

ATTORNEY FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

 I certify that a true and correct copy of the above and foregoing document has been served on each attorney of record or party in accordance with the Texas Rule of Civil Procedure 21a on this 19th day of June 2015.

*/s/Chris Osborn*
Christopher D. Osborn

Felix Rippy
3000 Joe DiMaggio, Ste. 3
Round Rock, TX 78665
512-310-9500
512-310-2580 fax

❒ hand-delivery

x❒ telecopy

❒ first class mail

❒ certified mail, return receipt requested

# ATTORNEY/CLIENT ENGAGEMENT AGREEMENT
### (Hourly Basis)

1. THIS ENGAGEMENT AGREEMENT ("Agreement") is made this __16__ day of __August__, 2014 at Round Rock, Texas by and between ___Shakeel Mustafa___, "Client", and Rippy & Taylor, PC "Attorney."

2. Client, in consideration of services to be rendered by Attorney to Client, retains Attorney to represent him/her as attorney in connection with ___Substitute in for Mr. Jarvis in 11·0061-FC1___ ___and get discovery status + Susan Wolf - Keiko Griffin's partner___ *Expanded* It is understood and agreed by the parties that Attorney's representation ends upon the entry of a final order *change of custody if* disposing of the Client's case and does not include the filing of any post-trial motions or appeals. *Sean Powls* ___$750 - 500 + 250 on arrears___ *100-mile lingual → sanctions-arrears*

3. If, in the future, Client desires Attorney to represent Client in any other matter, that will be the subject of additional discussions and an additional engagement agreement. Attorney's fee will include only services in connection with the matter listed in Paragraph 2 above.

**Client and Attorney agree:**

4. Attorney will devote his professional abilities to the matter, strive to keep Client informed of significant developments in this case and be reasonably available to answer inquiries. Client agrees to fully cooperate with Attorney, including but not limited to keeping Attorney advised of all developments related to this matter, informing Attorney promptly of any change in Client's address or telephone number, and promptly responding to Attorney's inquiries. Where applicable, neither Attorney nor Client will settle the case without the other's written approval.

5. Client empowers Attorney to take all steps in said matter deemed by Attorney to be advisable. Client understands and agrees that Attorney will, to the extent Attorney believes it to be reasonable, cooperate with any opposing attorney concerning settings for trial or hearing, scheduling depositions or meetings, and whether to request or agree to continuances or delays. The undersigned attorney may deem it advisable to refer Client's case to another attorney within the firm of Rippy & Taylor, PC, or to an attorney outside the firm. A referral to an attorney outside the firm may require a separate contract with that attorney and will not be done without Client's consent.

6. Client agrees to compensate Attorney for his services at the rate of $ __300__ per hour for the time which is devoted to Client's case with a minimum fee of $ __3500 credit__ which shall be considered earned at the time Attorney commences work on Client's case. Where applicable, this minimum fee is intended to compensate Attorney for the preparation and filing of initial pleadings, for allocating the time and resources of Attorney and the staff of the law firm to Client's case, for the nature and complexity of Client's case and the experience of the Attorney handling the matter and to compensate Attorney for the potentiality that, by accepting this employment, Attorney may also be precluded from accepting other employment. From time to time it may be necessary for other members of the law firm to assist in the Client's matter, and Client agrees to compensate Attorney for these services at the following rates:

*\* SEO optimization and "Felixrippyprize.com" and get reviews on YELP and AVVO reviews*

G:\FOR\forms\Fee Agreements\9-4-12 fee agreement.wpd

Partner attorney:               $300/hr

Legal assistant                 $ 75/hr

Client agrees to pay to Attorney all costs and disbursements incurred in said matter. For the following expenses, and no others, Attorney will charge a per case flat fee of $25.00: (1) long distance telephone charges; (2) in-office photocopy expenses; (3) first class postage (not certified or priority mail); and (4) facsimile charges. All other expenses will be billed to Client in the actual amount incurred.

7.      Client will pay Attorney the sum of $ 1st 35goFree as a retainer at the time of execution of this Agreement. Attorney will not take any action until the retainer is received. The retainer will be deposited in Attorney's trust account, and Attorney will draw against those funds to satisfy Attorney's monthly statements, copies of which will be sent to Client for Client's information. Upon depletion of the retainer, the Client agrees to deposit an additional retainer in an amount at least equal to the original retainer into Attorney's trust account. If an additional retainer fee is required, Client agrees to pay the amount required within ten (10) days of Attorney's request. Any funds remaining in the trust account at the end of the representation will be returned to Client at the time of the next billing period following termination of representation. **This retainer fee is not necessarily the total cost for the services of the Attorney. The total cost of legal services may exceed the retainer fee amount.**

8.      Client has the right to cancel this Agreement and terminate Attorney's representation at any time by written notice to Attorney. Client understands that Attorney has the right to cancel this Agreement and withdraw from representing Client if any of Attorney's invoices are not paid by Client within 30 days of the date that Attorney sends them to Client; if Client fails to deposit additional retainer funds as required by Paragraph 7; if the Client determines not to follow the Attorney's advice; fails to communicate with the Attorney; or if Attorney concludes for any other reason that Attorney is unable to represent Client. Attorney will provide written notice in the event that Attorney decides to withdraw from representation.

9.      In the event any legal action is taken to enforce this Agreement, Client consents to jurisdiction of the state of Texas and venue in Williamson County, Texas, and to all disagreements' being arbitrated pursuant to AAA arbitration rules. **CLIENT AND ATTORNEY AGREE THAT ALL DISPUTES ARISING OUT OF ATTORNEY'S REPRESENTATION OF CLIENT OR FEES CHARGED TO CLIENT SHALL BE ARBITRATED IN A BINDING ARBITRATION BEFORE AN ARBITRATOR IN WILLIAMSON COUNTY, TEXAS. UNLESS AN ARBITRATOR IS AGREED UPON BY THE PARTIES, THE ARBITRATOR SHALL BE APPOINTED BY THE JUDGE OF A COURT OF RECORD SITTING IN WILLIAMSON COUNTY, TEXAS. PRIOR TO ARBITRATION, CLIENT AGREES TO SUBMIT ANY COMPLAINTS REGARDING ATTORNEY'S REPRESENTATION OR DISPUTES REGARDING ATTORNEY'S FEES TO ATTORNEY IN WRITING. THE PARTIES AGREE TO MEDIATE ALL SUCH DISPUTES PRIOR TO ARBITRATION.**

There are advantages and disadvantages to arbitration as compared to a judicial resolution of disputes: 1) the cost and time of an arbitration is frequently less than that associated with a lawsuit; 2) the level of discovery may be reduced; 3) the rules of evidence may be relaxed; 4) the level of privacy in the arbitration process is greater than that found in courts; 5) significant rights are waived in an arbitration, including the right to a jury trial and the right to a judicial appeal because arbitration decisions can be challenged only on limited grounds. Arbitrators may allocate costs or fees in an arbitration as well as awarding monetary relief to a party.

G:\FOR\forms\Fee Agreements:9-1-12 fee agreement.wpd

APPENDIX PAGE 007

10. Client and Attorney agree that this Agreement is the entire agreement between them regarding the matters set forth herein and supercedes any prior oral or written discussions or agreements between them. This Agreement can only be amended by a subsequent written document signed by both Client and Attorney.

## FAVORABLE OUTCOME NOT GUARANTEED

11. Each case is different. Client understands that Attorney has made no representation concerning the successful termination of the claim or claims relating to the matter in controversy or the favorable outcome of any legal action that is or may be filed.

DATED: 08/16/2014

Rippy & Taylor, PC

SHAKEEL MUSTAFA By: Fct. N.
CLIENT                                  ATTORNEY

1800 Plateas Vista Ave #1020 3
Street Address

Rock Round, TX 78664
City, State, Zip

650-319-8188
Cell Number

sxm6719@gmail.com
Email Address

G:\FOR\forms\Fee Agreements\9-4-12 fee agreement.wpd

REPORTER'S RECORD

CAUSE NO. 15-0708-CC4

FELIX RIPPY                          )    IN THE COUNTY COURT

VS.                                  )    AT LAW NO. 4

SHAKEEL MUSTAFA                      )    WILLIAMSON COUNTY, TEXAS

HEARING ON MOTION FOR REFERRAL

On the 19th day of June, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable John B. McMaster, Judge presiding, held in Georgetown, Williamson County, Texas:

Proceedings reported by Computerized Machine Shorthand Method.

Thomas M. McMinn
Official Court Reporter
County Court at Law No. 4
Georgetown, Texas  78626
(512)943-1682

APPEARANCES

LAW OFFICE OF FELIX O'NEIL RIPPY
By:  Mr. Felix Rippy
SBOT No. 16937400
3000 Joe DiMaggio Blvd., Suite 3
Round Rock, Texas   78665
Tel 512-310-9500
Attorney for Plaintiff


THE LAW OFFICE OF CHRISTOPHER D. OSBORN
By: Mr. Chris Osborn
SBOT No. 24037221
1019 Cecelia Street
Taylor, Texas   76574
Tel 512-275-6593
Attorney for Defendant

P R O C E E D I N G S

* * *

THE COURT: Could I have an announcement, please, gentlemen? That would be 15-0708, be Rippy versus Mustafa.

MR. RIPPY: Judge, Felix Rippy, and I represent myself and the firm of Rippy & Taylor. You may recall, the Court adjourned the motion to refer the case to arbitration, and the re-pleading of the original lawsuit there is what I have just handed the Court.

Now, the first part that I have underlined is just the re-pleading saying, okay, I'm the majority shareholder and so I have the authority to proceed on behalf of the firm. The second part there on page one was already in the prior filing. So made it pretty clear that any dispute about the parties or who should be present is really a matter for the arbitration. What we are here for is to refer the case to arbitration. And because this the second time I have had to appear, here's our proposed order referring the case to arbitration, which you will notice has a blank for the arbitrator.

And I'll remind the Court we normally use either Gary Hargar or Jim Wallace in situations like this. And there's really no defense to it. So I added the second paragraph there for my attorney's fees for now having had

made two trips up here to try to get compliance of a clearly enforceable contractual obligation to arbitrate. Normally it's $450 per trip to Court, for the Court's edification, and I can testify to that, of course.

The bottom line is, the Court adjourned the hearing. There's really no excuse for not proceeding to arbitration. We do so all the time. And we need to have the other side ordered to do so and pay half the arbitrator's fee in accordance with the order we presented to the Court.

THE COURT: Mr. Osborn, what is your position?

MR. OSBORN: Yes, Your Honor. Here's our motion we filed late last night. We faxed it over to Mr. Rippy.

When we were here last time, Your Honor, the Court considered the special exceptions that we filed. There's some issues that we are going to need to get into, Your Honor, in terms of the original petition right now is seeking to throw Mr. Mustafa in jail until he pays the purported attorney's fees. And the reason he's saying that he can do that, and we all know we don't have debtor's prison, the reason he is saying he can do that is because he is violating a court order. And he's making reference to the final decree of divorce, the section in the decree that

says each party shall bear their own attorney's fees.

And the objection that we filed, we kind of go into the Texas Supreme Court's analysis on specificity with regard to an underlying order before it could be found to be contemptible.

We have also, Your Honor, objected to the purported assignment. When we were here last time, the main issue that we discussed with the Court was the fact that the attorney-client agreement is between Mr. Mustafa individually and the professional corporation of Rippy & Taylor, PC. We did some research, and it's kind of a unique issue where you have a professional corporation assigning its claims, it's prejudgment claims to the individual. Normally, the professional corporation exists to shield the individual.

So what makes this a little more complicated is not just the purported assignment, and there's this case styled Vinson & Elkins versus Moran, which was out of the 14th Court of Appeals in Houston, and they were looking at, you know, a specific type of assignment of the agreement pertaining to malpractice claims. They found that public policy analysis, that those types of claims shouldn't be assignable.

But the other thing, you know, we still renew all of our original special exceptions as to all of these

claims that he should be confined in jail, put on community supervision for ten years, and all of that, because Mr. Rippy also makes reference that he has other claims independent of those that have already been pled. So if there are in fact claims between them individually that don't arise out of the attorney-client agreement, those would not be subject to arbitration. So I think he needs to re-plead what those claims are.

And if there's a -- because another thing that makes this a little complicated, Your Honor, is Rippy & Taylor, PC agreed to accept services performed by Mr. Mustafa related to what's known as search engine optimization. So the attorney-client agreement gives him a $3,500 credit for that. Some of the disputes arise out of that relationship. So it's questionable and it's for the Court to decide if that arises out of the contract.

But, notwithstanding all that, of course our motion does ask for dismissal for failure to cure the defect in the parties, but we have also, Your Honor, filed our own motion to refer this case to alternative dispute resolution pursuant to the paragraph in the attorney-client agreement which provides that mediation shall be a first step before any arbitration is ordered.

So we are asking the Court to order this case to mediation, and then if it doesn't settle at that point,

then and only then is it ripe for arbitration.

Your Honor, my client will testify, depending on how much the Court wants to get into this, but the most linear approach in all honesty, Your Honor, is to grant our motion requesting the alternative dispute resolution with an order compelling us to go to mediation pursuant to the agreement and then to go to arbitration if the case doesn't settle. We can prepare an order abating this case pending outcome of arbitration. But that arbitration needs to be between Mr. Mustafa and Rippy & Taylor, PC because that's the only contractual relationship before the Court where there's an arbitration provision.

MR. RIPPY: Judge, I guess our response to that is that none of that has anything do with whether the arbitration provision is enforceable. Here's a little warmed-over brief from the class I teach on that exact subject. I will provide counsel with it, too.

But the bottom line is, the arbitrator will govern the procedures relating to discovery. Once we have done adequate discovery, we certainly don't oppose mediation. I'm pretty sure Jim Wallace as a mediator will order us to mediation although not with he himself. So all of that can happen. But the first thing that needs to happen is the Court needs to refer the case to arbitration.

And you kind of get the idea why we added the

attorney's fees paragraph to this order referring to arbitration. I have never seen so much wiggling to try to get out of one's contractual obligation to arbitrate that is clearly stated. So any complaints about who the parties are or what the causes of action are, or specially excepting to the petition, need to be presented to the arbitrator. And once we have had a little time for discovery, certainly we are not going to oppose mediation.

I will say this. In this brief I just handed the Court, there's a reference to a very interesting case, Dr. Brown versus Fullenweider, where the big Fullenweider family law firm out of Houston sued somebody named Dr. Brown on the grounds that the divorce decree said you shall pay your own lawyers and enforced it on the basis of that obligation imposed, not just on the parties to the divorce, but the court's order in a divorce. Went all the way to the Texas Supreme Court, remanded. Ultimate result, Dr. Brown owed the Fullenweider firm a bunch of money. So that's an interesting aside.

And as I pointed out to the Court, it has nothing to do with referring the case to arbitration, but I thought I would respond to that. If you're ordered to pay your lawyer, even your own lawyer by a sitting Texas judge in a divorce decree, you expose yourself to contempt.

Now, frankly, arbitration provision in some

regards helps the other side because I don't think that, for example, Jim Wallace is going to order anyone to be on probation for contempt, but he could. And if that's his recommendation and we come back to Court, I guess we will be asking for that. None of that has anything to do with referring the case to arbitration to begin with because there hasn't been any orders like that.

THE COURT: Let me explain very briefly, gentlemen, in regards to what the Court sees its role today.

I determine today whether or not to refer this case to arbitration, but now mediation. I would like to know, does your contract, which I do not have in front of me, have a stair step mediation provision leading up to arbitration? Does the contract provide for it?

MR. RIPPY: It certainly does provide for mediation. I think you probably do have in front of you because I think it's attached to the back of that petition.

MR. OSBORN: It's attached to the original petition. We attached it to our motion, Your Honor, and we highlighted the section, the arbitration provision. It's on the last page.

THE COURT: All right.

MR. RIPPY: No question it requires mediation at some point. The question is sort of who orders it.

THE COURT: Well, here's the Court's thought

on that. You're going to alternative dispute resolution today, gentlemen. That's what is going to happen because your contract provides for it. I believe the pleadings are in line now for me to order it, so that's where you're headed.

Now, question for me is does the contract require a stair step mediation, then arbitration. And I want to know exactly what the contract says.

MR. OSBORN: It's that last sentence of the highlighted provisions there, Your Honor, in terms of it's mediation prior to arbitration.

MR. RIPPY: And, judge, I think that's right. I just think it's not mediation prior to referral to arbitration because, obviously, you're allowed to conduct some discovery before mediation. Otherwise, mediation is less likely to be successful.

THE COURT: What the Court's goal, and I think the goal of the law is, is that you resolve your issue. I believe that the best way for you to resolve your issue is by an attempted mediation. If mediation fails, then arbitration. I believe that that certainly follows along the spirit of the agreement and of the contract, and I think specifically that's what the contract provides for. Mr. Rippy, am I incorrect in my interpretation?

MR. RIPPY: Well, no question the Court is

correct, mediation is required, absolutely. So the only question is before or after the Court refers the case to an arbitrator so we can find out do we depose each other before the mediation, what information do we exchange. So what the contract says is mediation prior to arbitration. Not prior to referral to arbitration.

THE COURT: The only thing that I'm -- and that's a good argument that you're making. Because do you view that you go to the arbitrator, the arbitrator gets you both together, lays out a discovery control plan, you each exchange your documents so you can be fully aware of what is going on, then you go to the mediator, you can go through the mediation process, and then if mediation fails, you go and the arbitrator makes the final determination?

MR. RIPPY: Exactly right. That's how it always works. And it doesn't say that in the order referring the case to arbitration, but we certainly don't oppose -- we aren't opposed to and don't oppose the Court interlineating the order to say, okay, as soon as we get a discovery control plan and the arbitrator thinks enough discovery has taken place, we are going to mediate with, you know, Josh Murray or somebody, that's fine. That's an interlineation, it's okay by us.

But what we don't want to do is keep having to come back to Court like this just to get the referral to

12

arbitration when it's so clearly contractually enforceable.

THE COURT: The Court is of the opinion, as I stated earlier, I'm compelling alternative dispute resolution. So now it's the framework.

Now, the framework being arbitration first so that you enter into a discovery control plan. You do your discovery and then you do the mediation and then you go back to arbitration if the mediation fails. Do either one of you have a difficulty with that construct?

MR. OSBORN: No, Your Honor. Just one point of clarification in terms of what we are requesting.

We are requesting that the arbitration, and we don't have a problem with the timeline the Court just announced, but that the American Arbitration Association, consumer arbitration rules be the rules that are applied. That does have a profound impact on his out-of-pocket expenses related to the arbitration itself. So we are asking that the Court order arbitration pursuant to the AAA consumer arbitration rules. I don't think there's any doubt he's a consumer in this context, so those are the applicable rules. Not the commercial rules but the consumer rules.

MR. RIPPY: Well, that's -- okay. Short answer no, we don't have a problem with that timeline. But that sort of halfway objection to the timeline shows exactly the problem.

THE COURT: I think I can shortcut this. I'm going to let the arbitrator make that determination at this point. I'm just ordering the referral. I'm not making determinations. I'm even uncomfortable to some extent based on rules concerning what I can do laying out the framework, but I'm really doing that more as a guide to the arbitrator. I'm going to let the arbitrator pick the mediator as opposed to me doing that.

So I'm going to put Gary Hargar on as the mediator. I do that because Judge Hargar has extensive family law experience, and I believe that based on his background he would be well suited having practiced family law as well. So I think that he would be the arbitrator that the Court would select for you.

MR. RIPPY: Yes, sir.

THE COURT: All other issues, other than just the framework that I laid out, I'm going to defer to the arbitrator who is Gary Hargar. Yes, counsel?

MR. OSBORN: The AAA consumer arbitration rules have a system where they send each side five potential arbitrators and that each side has an opportunity to strike.

THE COURT: Then I'm going to not employ their rules.

MR. OSBORN: Okay.

THE COURT: I'm going to select Gary Hargar

because what I want is a resolution to your issue. I believe that he is the best man to accomplish that goal. So I'm ordering Gary Hargar.

In regard to the attorney's fees, obviously there were issues between the two of you, I do not believe this was frivolous. I believe I'm going to treat this as a misunderstanding and I'm not going to order either side attorney's fees. But I am going to grant your relief, counsel, and order Gary Hargar as the arbitrator.

MR. RIPPY: Yes, sir. Permission to withdraw from the bench?

THE COURT: Absolutely.

MR. OSBORN: Thank you, Your Honor.

(Proceedings concluded)

15

COURT REPORTER'S CERTIFICATE

THE STATE OF TEXAS           )

COUNTY OF WILLIAMSON         )

        I, Thomas M. McMinn, Official Court Reporter in and for the County Court at Law No. 4 of Williamson County, State of Texas, do hereby certify that the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel or other parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered into evidence.

        WITNESS MY OFFICIAL HAND this the 4th day of August, 2015.

_____

Thomas M. McMinn, CSR #1244
Expiration date: 12/31/16
Official Court Reporter
County Court at Law No. 4
405 MLK, Box 17
Georgetown, Texas   78626
(512)943-1682



**Christopher D. Osborn <chris@osbornpc.com>**

## Re: Rippy et al vs Mustafa
1 message

| | |
|---|---|
| **gary@hargermediation.com** <gary@hargermediation.com> | Wed, Oct 7, 2015 at 9:16 AM |

To: chris@osbornpc.com, Felix Rippy <felixrippy@aol.com>, Sharrion Threadgill <sthreadgill@wilco.org>

Gentleman,
1. I am going to make a referral of the jurisdictional issue to Judge McMaster requesting an immediate hearing.
2. This will not be filed with American Arbitration Association.
3. You were instructed more than a month ago to take your recusal back to the Court that assigned me to arbitrate, otherwise I will hear the case.

I am copying the court administrator to set the jx issue at Judge McMaster's discretion.

Judge Harger

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Christopher D. Osborn
**Date:** Wed, Oct 7, 2015 7:53 AM
**To:** Judge Gary Harger;Felix Rippy;
**Subject:**Availability

I am available the week of 11/2 to 11/6, and 11/12 and 11/13..

However, Felix has indicated his claims exceed or approach the jurisdictional limits of the county court at law and it is clear that this matter should not be expedited in a manner that prevents my client from having the opportunity to conduct discovery related to these purportedly huge claims by Mr Rippy. Further, there is a need to ensure that the Professional Corporation is a party to the lawsuit. Additionally, there is an obvious need to conduct discovery related to Felix's claims which he now indicates are greater than six figures. We believe it is unreasonable not to allow any discovery other than the request for production that was previously issued, which also failed to adequately respond to our request. In other words, there is a need for consideration of a motion to compel adequate responses to our request for production. Additionally, we have previously sent request for admissions and interrogatories, and we respectfully request that those be allowed to be answered, in addition to allowing us to the depose Mr Rippy. We also sent a request for disclosure and the response has never been submitted.

Additionally, this matter should be proceeding pursuant to the American Arbitration Association rules for consumers, as the arbitration agreement is quite clear on this particular issue. In other words this matter needs to be filed with the American Arbitration Association, to ensure that their rules are followed.

Additionally, we need full consideration of our motion for Judge Harger to recuse himself based on his ongoing business relationship with Mr Rippy and based on the fact that he served as mediator in the underlying case, where sensitive information was disclosed by my client.

This is just a summary of the important issues. I have attached a copy of our motion for en banc reconsideration by the third Court of Appeals. The American Arbitration Association rules very clearly allow my client to conduct discovery related to his claims and his defenses. It is imperative that the American Arbitration Association rules are followed here, which include not only the procedural rules but the American Arbitration Association serving as the clerk responsible for receiving any and all filings. At present the only system we have is the emails that have been sent back and forth.

Again this is just a summary of some of the more important issues, and I will follow up with a more detailed

APPENDIX PAGE 024

email regarding same. However it is imperative for due process considerations that discovery be allowed to be conducted in this case, and that we allowed to seek a motion to compel related to the adequacy of Mr Rippy's response.

I will also need to confirm with my client that he is available on those dates.

Chris

 **Motion for En Banc Reconsideration - final draft.pdf**

APPENDIX PAGE 025



Christopher D. Osborn <chris@osbornpc.com>

---

# Rippy v. Mustafa v. Rippy & Taylor, P.C.

---

**Judge Gary Harger** <gary@hargermediation.com>                    Thu, Sep 10, 2015 at 3:28 PM
To: "Christopher D. Osborn" <chris@osbornpc.com>, Felix Rippy <Felixrippy@aol.com>
Cc: gary@hargermediation.com

Mr. Osborn & Mr. Rippy,

==Neither the right to conduct further discovery nor the right to amend or plead new causes of action have been opened at this point in time.==    As mentioned in my prior email I am abating only for the purposes of the Motion for Rehearing filed with the 3rd Court of Appeals.    In the interim, I want to clarify my position regarding continuation of the case.

Mr. Osborn, as you are aware, I was assigned this case by Court order from Judge McMaster.  If you believe there is a problem with the assignment, then file a motion immediately seeking the Judge amend or vacate the order based on  what you or your client perceives to be a conflict.  Otherwise, once the 3rd Court has responded, I will proceed if appropriate to get this matter set.

In light of the multitude of emails and the multitude of issues and positional statements, it does not appear at this time as though this can be arbitrated in one day.  IF the Motion for Rehearing is denied and if Judge McMaster does not assign someone else to hear the matter, then I expect to hold one more pre-arbitration conference and set this for hearing as soon as possible.

Regards,

G.Harger

---

**From:** Christopher D. Osborn [mailto:chris@osbornpc.com]
**Sent:** Thursday, September 10, 2015 6:48 AM
**To:** Judge Gary Harger; Felix Rippy
**Subject:** Rippy v. Mustafa v. Rippy & Taylor, P.C.

Judge Harger: Mr. Mustafa asked that I renew my request for you to reconsider his request to recuse yourself from this arbitration.

Please see attached.

## AFFIDAVIT OF SHAKEEL MUSTAFA
### CASE # 15-0708-CC4

(1)     My name is Shakeel Mustafa and I'm defendant in this Case. I am over the age of 18, have never been convicted of any crime nor diagnosed with any mental disease or psychological disorder, and am otherwise competent to make this affidavit.

(2)     I believe Judge Gary Harger has not been selected according the AAA Arbitration Rules as per the language of my Retainer Agreement with Felix Rippy

(3)     I further understand that Mr. Chris Osborne has not agreed to change the terms and interpretation of my Retainer Agreement with Felix Rippy.

(4)     Mr. Felix Rippy also represented me in a Mediation of my family law case last year with Judge Gary Harger who acted as a Mediator in my case.

(5)     I spoke to Judge Gary Harger alone during the mediation session and shared a lot of my personal and private information with him.

(6)     I also believe that my ex-wife, Pakiza Asim, shared information with Judge Gary Harger during the Mediation which were adversarial to me.

(7)     I further understand that Mr. Felix Rippy routinely brings his family law cases to Judge Gary Harger for mediation which financially benefits Judge Harger

(8)     I believe this financial benefit from Mr. Felix Rippy may impact the impartiality of Judge Gary Harger

(9)     Affiant makes all of the above-and-foregoing statements under penalty of perjury based on his personal information obtained after reasonable investigation, and his resulting reasonable inferences, conclusions, and beliefs.


Signed and executed in Round Rock, Texas on this 9th day of September, 2015.


SHAKEEL MUSTAFA
1832 Bayland Street,
Round Rock, TX 78664

*Affidavit of Shakeel Mustafa – Case # 15-0708-CC4*                    1

JURAT

Shakeel Mustafa personally appeared before me on this 9th day of September, 2015, and, having duly taken his oath under penalty of perjury, did acknowledge and verify the above-and-foregoing Affidavit in Cause No. 15-0708-CC4

LA TRICIA BRADSHAW
Notary Public, State of Texas
My Commission Expires
JULY 11, 2019

Notary Public, Williamson County
State of Texas

Printed Name of Notary: _LaTricia Bradshaw_

My Commission Expires: _7/11/19_

## AFFIDAVIT OF SHAKEEL MUSTAFA
### CASE # 15-0708-CC4

(1)    "My name is Shakeel Mustafa and I'm defendant in this Case. I am over the age of 18, have never been convicted of any crime nor diagnosed with any mental disease or psychological disorder, and am otherwise competent to make this affidavit.

(2)    Mr. Rippy has asserted claims beyond a breach of contract claim, and I need additional time to engage in discovery to investigate truth as a defense and what Mr. Rippy's damages include.  I also have asserted violations of the Deceptive Trade Practices Act, and I need to engage in discovery related to those claims.

(3)    There is currently pending prosecution of Mr. Rippy related to my grievances against Mr. Rippy, which was initially filed on April 25, 2015, with the State Bar of Texas.  Mr. Rippy was given the opportunity to reply to my grievances. After review, and initial investigation the State Bar of Texas upgraded my grievance to a full complaint. My Complaint was further investigated by the State Bar of Texas through the assigned Administrative Attorney.

(4)    On about August 21, 2015, I was informed by the State Bar of Texas that Ms. Rebecca (Beth) Stevens (Assistant Disciplinary Counsel) will be handling the prosecution of Mr. Rippy for the violation of multiple Rules of Professional Conduct. I've been asked to testify and also provide a voluminous amount of documentation for the case.  The Office of Chief Disciplinary Counsel - State Bar of Texas has directed me to fully cooperate and provide them with all of the relevant information.

(5)    Mr. Rippy filed this lawsuit one day after his response to my initial bar complaint, and I believe this lawsuit is retaliation for the complaint.  I also believe that Mr. Rippy's discovery requests that include information irrelevant to both the breach of contract claim and defamation claim will require substantial additional time than initially anticipated.  Further, I am requesting that this arbitration be continued until after the State Bar has conducted the hearing between these same parties.

(6)    I am not seeking this continuance for delay only, but so that justice can be done. Affiant makes all of the above-and-foregoing statements under penalty of perjury based on his personal information obtained after reasonable investigation, and his resulting reasonable inferences, conclusions, and beliefs."

Signed and executed in Round Rock, Texas on this 31st day of August, 2015.


SHAKEEL MUSTAFA
1832 Bayland Street,
Round Rock, TX 78664



JOHN P. CORONA
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 19, 2015

*Affidavit of Shakeel Mustafa – Case # 15-0708-CC4*

APPENDIX PAGE 029

JURAT

*S.M*
*2C*
*1st*

*S.M*
*2C*
*September*

Shakeel Mustafa personally appeared before me on this ~~31st~~ day of ~~August~~, 2015, and, having duly taken his oath under penalty of perjury, did acknowledge and verify the above-and-foregoing Affidavit in Cause No. 15-0708-CC4

_____
Notary Public, Williamson County
State of Texas

Printed Name of Notary: __John P. Corong__

My Commission Expires: __12-19-2015__



JOHN P. CORONA
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 19, 2015

*Affidavit of Shakeel Mustafa – Case # 15-0708-CC4*                                    2

APPENDIX PAGE 030

## AFFIDAVIT OF SHAKEEL MUSTAFA
### CASE # 03-15-00422-CV

BEFORE ME the undersigned notary public appeared Shakeel Mustafa, who after being sworn in made the following statement under oath and penalty of perjury:

(1) My name is Shakeel Mustafa and I am the defendant in this Case. I am over the age of 18, have never been convicted of any crime nor diagnosed with any mental disease or psychological disorder, and am otherwise competent to make this affidavit. I make the statements made herein based on my personal knowledge.

(2) I am currently involved in an arbitration before Judge Gary Harger, who was appointed by Judge McMaster of Williamson County Court at Law Number Four.

(3) On May 15, 2015, my former attorney Felix Rippy filed a lawsuit against me for the attorney fee. At the time of filing of the lawsuit, he provided a figure of $17,500. The arbitration agreement requires that the American Arbitration Association ("AAA") Rules shall be followed, but Judge Harger has indicated that we are not allowed to follow the AAA Rules.

(4) On September 04, 2015, my Attorney Chris Osborn sent me attachments via email and one of the attachment was a "Billing Statement" that he received from Felix Rippy

(5) This was the very first time that I ever saw this "Billing Statement" and the items included and the charges mentioned in this "Billing Statement"

(6) The date printed at the top of the "Billing Statement" was "August 26, 2015"

(7) The very first time I ever came to know the following on September 04, 2015:
  (a) The "sub-total – all fee owed so far" was $41,210. This is the "Billing Statement" coming from my former attorney, Felix Rippy, who filed the ONLY document "Substitution of the Attorney Form" in my Case with the Court prior to my final hearing held on Oct. 14, 2014
  (b) I also came to know that the "legal additional fee for grievance defense – compounding" was $8,000

(8) On September 10, 2015, I sent the attached Affidavit to Judge Gary Harger through my attorney Chris Osborn

(9) Among other facts, I also stated the following in my attached Affidavit, "I further understand that Mr. Felix Rippy routinely brings his family law cases to Judge Gary Harger for mediation which financially benefits Judge Harger" and "I believe this financial benefit from Mr. Felix Rippy may impact the impartiality of Judge Gary Harger"

(10) I received a document titled as "**ARBITRATION RULES**" through my Attorney Chris Osborn that he received from Judge Gary Harger.

(11) I believe these "**ARBITRATION RULES**" are different than AAA Arbitration Rules. My Agreement with Rippy & Taylor P.C. stated the following:
"…and to all disagreement being arbitrated pursuant AAA arbitration rules"

(12) Section 1 (e) of the "**ARBITRATION RULES**" states the following:
"The arbitrator **shall** disclose to the parties any circumstance likely to affect impartiality, including any bias or financial or personal interest in the result of the

arbitration and <u>any past or present business or professional relationship with the parties</u> or their counsel

(13) I believe Judge Gary Harger has the obligation to disclose the information specifically mentioned in the above paragraph. So far, neither I nor my attorney has received any disclosure information related to the above paragraph from Judge Gary Harger

(14) Affiant makes all of the above-and-foregoing statements under penalty of perjury based on his personal information obtained after reasonable investigation, and his resulting reasonable inferences, conclusions, and beliefs..

Signed and executed in Williamson County, Texas on this 7th day of October, 2015.

SHAKEEL MUSTAFA
1832 Bayland Street,
Round Rock, TX 78664

JURAT

Shakeel Mustafa personally appeared before me on this 7th day of October, 2015, and, having duly taken his oath under penalty of perjury, did acknowledge and verify the above-and-foregoing Affidavit in Case # 03-15-00422-CV

Notary Public, Williamson County
State of Texas



CHRISTOPHER D. OSBORN
MY COMMISSION EXPIRES
March 19, 2017



## ill be leaving town for good nov. 2, 2015

**felix** <felixrippy@aol.com>                                    Sun, Oct 4, 2015 at 4:31 PM
To: Judge Gary Harger <gary@hargermediation.com>, "Christopher D. Osborn" <chris@osbornpc.com>

obviously given the bank record discovery provided --and 100% due to mustafa, after 26 years our lawfirm has failed--my new job starts out of state beginning after Thanksgiving, so we'll need to get this arbitrated before then -- and discuss whether the jurisdictional limits applicable to cc4 and judge mcmaster apply in the arbitration

i do have the dates of oct 13-16 available ---how are u all for Friday the 16th of October ?
felix rippy

Sent from my iPhone



*Consumer Due Process* PROTOCOL

Statement of Principles of the National Consumer Disputes Advisory Committee

[Statement of Principles](#)
[Introduction: Genesis of the Advisory Committee](#)
[Scope of the Consumer Due Process](#)
[Glossary of Terms](#)
[Major Standards and Sources](#)
[Principle 1. Fundamentally-Fair Process](#)
[Principle 2. Access to Information Regarding ADR Program](#)
[Principle 3. Independent and Impartial Neutral; Independent Administration](#)
[Principle 4. Quality and Competence of Neutrals](#)
[Principle 5. Small Claims](#)
[Principle 6. Reasonable Cost](#)
[Principle 7. Reasonably Convenient Location](#)
[Principle 8. Reasonable Time Limits](#)
[Principle 9. Right to Representation](#)
[Principle 10. Mediation](#)
[Principle 11. Agreements to Arbitrate](#)
[Principle 12. Arbitration Hearings](#)
[Principle 13. Access to Information](#)
[Principle 14. Arbitral Remedies](#)
[Principle 15. Arbitration Awards](#)
[LIST OF SIGNATORIES](#)

**STATEMENT OF PRINCIPLES**

**PRINCIPLE 1. FUNDAMENTALLY-FAIR PROCESS**

*All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.*

**PRINCIPLE 2. ACCESS TO INFORMATION REGARDING ADR PROGRAM**

*Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.*

## PRINCIPLE 3. INDEPENDENT AND IMPARTIAL NEUTRAL; INDEPENDENT ADMINISTRATION

1.  *Independent and Impartial Neutral. All parties are entitled to a Neutral who is independent and impartial.*

2.  *Independent Administration. If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.*

3.  *Standards for Neutrals. The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.*

4.  *Selection of Neutrals. The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.*

5.  *Disclosure and Disqualification. Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.*

## PRINCIPLE 4. QUALITY AND COMPETENCE OF NEUTRALS

*All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.*

## PRINCIPLE 5. SMALL CLAIMS

*Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.*

## PRINCIPLE 6. REASONABLE COST

1.  *Reasonable Cost. Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.*

2.  *Handling of Payment. In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.*

## PRINCIPLE 7. REASONABLY CONVENIENT LOCATION

*In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.*

## PRINCIPLE 8. REASONABLE TIME LIMITS

*ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.*

## PRINCIPLE 9. RIGHT TO REPRESENTATION

*All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.*

## PRINCIPLE 10. MEDIATION

*The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.*

## PRINCIPLE 11. AGREEMENTS TO ARBITRATE

*Consumers should be given:*

    a. *clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;*
    b. *reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;*
    c. *notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,*
    d. *a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.*

## PRINCIPLE 12. ARBITRATION HEARINGS

1. *Fundamentally-Fair Hearing. All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision-makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.*

2. *Confidentiality in Arbitration. Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.*

## PRINCIPLE 13. ACCESS TO INFORMATION

*No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.*

## PRINCIPLE 14. ARBITRAL REMEDIES

*The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.*

## PRINCIPLE 15. ARBITRATION AWARDS

1. *Final and Binding Award; Limited Scope of Review. If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.*

2. *Standards to Guide Arbitrator Decision-Making. In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.*

3. *Explanation of Award. At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.*

## INTRODUCTION: GENESIS OF THE ADVISORY COMMITTEE

Recent years have seen a pronounced trend toward incorporation of out-of-court conflict resolution processes in standardized agreements presented to consumers of goods and services. Some of these processes (such as mediation and non-binding evaluation) involve third party intervention in settlement negotiations; others involve adjudication (binding arbitration). Such processes have the potential to be of significant value in making dispute resolution quicker, less costly, and more satisfying. [1]

Yet because consumer contracts often do not involve arm's length negotiation of terms, and frequently consist of boilerplate language presented on a take-it-or-leave it basis by suppliers of goods or services, there are legitimate concerns regarding the fairness of consumer conflict resolution mechanisms required by suppliers. This is particularly true in the realm of binding arbitration, where the courts are displaced by private adjudication systems. In such cases, consumers are often unaware of their procedural rights and obligations until the realities of out-of-court arbitration are revealed to them after disputes have arisen. [2] While the results may be entirely satisfactory, they may also fall short of consumers' reasonable expectations of fairness [3] and have a significant impact on consumers' substantive rights and remedies. [4]

The use of mediation and other forms of alternative dispute resolution (ADR) by various state and federal courts has also raised concerns regarding quality, effectiveness and fairness. The response has been a number of national, state and local initiatives to establish standards for the guidance and information of courts. Until now, however, there has been no comparable national effort in the private consumer sphere.

In the spring of 1997, the American Arbitration Association (AAA) announced the establishment of a National Consumer Disputes Advisory Committee. The stated mission of the Advisory Committee is:

> *To bring together a broad, diverse, representative national advisory committee to advise the American Arbitration Association in the development of standards and procedures for the equitable resolution of consumer disputes.*

In light of its stated mission, the Advisory Committee's recommendations are likely to have a direct impact on the development of rules, procedures and policies for the resolution of consumer disputes under the auspices of the AAA.

The Advisory Committee's recommendations may also have a significant impact in the broader realm of consumer ADR. A Statement of Principles which is perceived as a broadly-based consensus regarding minimum requirements for mediation and arbitration programs for consumers of goods and services may influence the evolution of consumer rules generally and the development of state and federal laws governing consumer arbitration agreements. The standards may affect the drafting of statutes and influence judicial opinions addressing the enforceability of arbitration agreements pursuant to existing state or federal law. [5]

---

1. See, *e.g.*, CPR Institute for Dispute Resolution, *ADR Cost Savings & Benefit Studies* (Catherine Cronin-Harris, ed. 1994) (summarizing some of the research findings on the relative advantages ADR may offer). See also, *e.g.*, *Madden v. Kaiser Foundation Hosp.*, 17 Cal. 3d 699, 711, 552 P.2d 1178, 1186 (1976) ("The speed and economy of arbitration, in contrast to the expense and delay of a jury trial, could prove helpful to all parties....")

2. The arbitration agreement may be included in the "fine print" in a brochure of terms and conditions inside a box of goods. See, *e.g.* , *Hill v. Gateway 2000, Inc.* , 105 F.3d 1147 (7th Cir. 1997) (Customers agreed to computer company's contract terms, including arbitration agreement, by failing to return merchandise within 30 days). See *Age of Compelled Arbitration*, 1997, Wis. L. Rev33, 40-53 (Offering a "cautionary tale" regarding employment arbitration agreement.)

3. See Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. On Disp. Res. 267 (1995) (discussing procedural limitations of arbitration in treating consumer disputes with banks and lenders); Schwartz, *supra* note 2 (discussing issues relating to adhesion contracts involving employees and consumers); Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns* , 72 Tulane L. Rev. 1 (1997) (discussing due process concerns with binding arbitration under employment and consumer contracts). See, e.g., *Engalla V. Permanente Med. Grp.* , 938 P.2d 903 (Cal. 1997) (medical group may not compel arbitration where it administers own arbitration program, fraudulently misrepresents speed of arbitrator selection process, and the forces delays); *Broemmer V. Abortion Serv. of Phoenix* , 840 P.2d 1013 (Az. 1992) (refusing to enforce agreement in "adhesion contract" where drafter inserted potentially self-serving term requiring sole arbitrator of medical malpractice claims to be licensed medical doctor).

4. See Schwartz, *supra* note 2, at 60-61 (discussing perceptions regarding relative damages awards in court and in arbitration), 64-66 (summarizing some statistics on arbitration awards). See also William W. Park, *When and Why Arbitration Matters*, in The Commercial Way to Justice 73, 75 (G.M. Beresfort Hartwell ed., 1997) (" *Who* interprets an...agreement will frequently be more significant than *what* the applicable law says about the agreement....").

5. See, e.g., *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C.Cir. 1997) (Citing Due Process Protocol for Employment Disputes). The consensus-based approach of the broadly constituted group reflects the "public interest" model espoused by Professor Speidel. See Richard E. Speidel, *Contract Theory and Securities Arbitration: Whither Consent?* , 62 Brook. L. Rev. 1335 (1996).

## SCOPE OF THE CONSUMER DUE PROCESS PROTOCOL

The Consumer Due Process Protocol (Protocol) was developed to address the wide range of consumer transactions those involving the purchase or lease of goods or services for personal, family or household use. These include, among other things, transactions involving: banking, credit cards, home loans and other financial services; health care services; brokerage services; home construction and improvements; insurance; communications; and the purchase and lease of motor vehicles and other personal property.

Across this broad spectrum of consumer transactions, the Protocol applies to all possible conflicts from small claims to complex disputes. In light of these realities, the Advisory Committee sought to develop principles which would establish clear benchmarks for conflict resolution processes involving consumers, while recognizing that a process appropriate in one context may be inappropriate in another. Therefore, the Protocol embodies flexible standards which permit consideration of specific circumstances.

In some cases, the AAA is developing or has developed special dispute resolution policies and procedures governing particular transactional systems. A recent example is its current initiative with respect to ADR in contracts for health care services. Where the general principles set forth in this Protocol conflict with more specific standards developed under the auspices of the AAA or some other independent organization with relatively broad participation by affected parties, the latter should govern.

There are other transactions that share many of the features of consumer transactions, such as those involving small businesses and individual employment contracts. While the Protocol was not developed for specific application to such other transactions, there may be circumstances in which the Protocol might be applied by analogy to ADR in those venues. The Principles articulated here are likely to have an impact on minimum standards of due process for other ADR systems involving persons of disparate bargaining power.

Each section of this document is devoted to treatment of a discrete topic concerning consumer ADR. It begins with a basic Principle that embodies the fundamental reasonable expectation of consumers as defined by the Advisory Committee. Each Principle is accompanied by Reporter's Comments that explain the rationale of the Advisory Committee in the context of other emerging standards. In addition, some Principles are supplemented by Practical Suggestions for putting the Principles into practice.

The specific mention of mediation and binding arbitration reflects the current emphasis on these processes in consumer conflict resolution. The Advisory Committee recognizes that a number of

other approaches are being employed to resolve commercial and consumer disputes, and encourages their use in accordance with the spirit of the Protocol.

The signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations. Although the following Principles reflect a remarkable degree of consensus, achieved during the course of several meetings of the entire Advisory Committee, subcommittee deliberations, exchanges of numerous memoranda and of five drafts of the Protocol, Advisory Committee members at times accepted compromise in the interest of arriving at a common ground. As was the case with the task force which developed the *Employment Due Process Protocol*, opinions regarding the appropriateness of binding pre-dispute arbitration agreements in consumer contracts were never fully reconciled. Like that group, however, the Advisory Committee was able to address standards for ADR processes within the given context.

## GLOSSARY OF TERMS

Consumer
Consumer refers to an individual who purchases or leases goods or services, or contracts to purchase or lease goods or services, intended primarily for personal, family or household use.

Provider
Provider refers to a seller or lessor of goods or services to Consumers for personal, family or household use.

ADR Process
An ADR (Alternative Dispute Resolution) Process is a method for out-of-court resolution of conflict through the intervention of third parties. Mediation and arbitration are two widely used ADR processes.

Mediation
Mediation refers to a range of processes in which an impartial person helps parties to a dispute to communicate and to make voluntary, informed choices in an effort to resolve their dispute. A mediator, unlike an arbitrator, does not issue a decision regarding the merits of the dispute, but instead facilitates a dialogue between the parties with the view of helping them arrive at a mutually agreeable settlement.

Arbitration
Arbitration is a process in which parties submit disputes to a neutral third person or persons for a decision on the merits. Each party has an opportunity to present evidence to the arbitrator(s) in writing or through witnesses. Arbitration proceedings tend to be more informal than court proceedings and adherence to judicial rules of evidence is not usually required. Arbitrators decide cases by issuing written decisions or "awards." An award may or may not be binding on the parties, depending on the agreement to arbitrate. A "binding" arbitration award may be enforced as a court judgment under the terms of federal or state statutes, but judicial review of arbitration awards is limited.

<u>Neutral</u>
A Neutral is a mediator, arbitrator, or other independent, impartial third party selected to intervene in a Consumer-Provider dispute.

<u>ADR Agreement</u>
An ADR Agreement is an agreement between a Provider and a Consumer to submit disputes to mediation, arbitration, or other ADR Processes. As used in this Statement, the term includes provisions (sometimes incorporated by reference) in standard contracts furnished by Providers which signify the assent of the Consumer and Provider to such processes (although the assent may only be the "generalized assent" typically given by Consumers to standard terms).

<u>ADR Program</u>
An ADR Program is any program or service established by or utilized by a Provider of goods and services for out-of-court resolution of Consumer disputes. The term includes ADR rules and procedures and implementation of administrative structures.

<u>Independent ADR Institution</u>
An Independent ADR Institution is an organization that provides independent and impartial administration of ADR Programs for Consumers and Providers, including, but not limited to, development and administration of ADR policies and procedures and the training and appointment of Neutrals.

**MAJOR STANDARDS AND SOURCES**

The Reporter's Comments accompanying these Principles cite a number of existing standards and sources relied upon by the Advisory Committee. The more frequently cited standards and sources are set forth below by their full title as well as the abbreviated title that appears in the Comments.

American Arbitration Association, *Commercial Arbitration Rules*, July 1, 1996 (AAA Commercial Rules)

American Arbitration Association, *Construction Industry Dispute Resolution Procedures*, Oct. 15, 1997 (AAA Construction Procedures)

American Arbitration Association, *Wireless Industry Arbitration Rules*, July 15, 1997 (AAA Wireless Rules)

American Arbitration Association & American Bar Association, *Code of Ethics for Arbitrators in Commercial Disputes* (1977) (Code of Ethics for Arbitrators)

Center for Dispute Settlement, Institute of Judicial Admin., *Standards for Court-Connected Mediation Programs* (Standards for Court-Connected Programs)

Council of Better Business Bureaus, Inc., *Arbitration (Binding)* (BBB Arbitration Rules)

CPR-Georgetown Commission on Ethics and Standards in ADR Working Group on Provider Organizations, *Principles for ADR Provider Organizations* (Draft of April 4, 1998) (Principles for ADR Provider Organizations)

*Federal Arbitration Act*, 9 U.S.C. " 1-16 (as amended and in effect July 1, 1992) (Federal Arbitration Act)

Blue-Ribbon Advisory Panel on Kaiser Permanente Arbitration, *The Kaiser Permanente Arbitration System: A Review and Recommendations for Improvement* 1 (1998) (Kaiser Permanente Review and Recommendations)

Joint Committee (American Arbitration Association, American Bar Association and Society of Professionals in Dispute Resolution) on Standards of Conduct, *Standards of Conduct for Mediators* (1994) (Joint Standards for Mediators)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Ensuring Competence and Quality in Dispute Resolution Practice* (Draft Report 1994)(SPIDR Report on Qualifications)

Society of Professionals in Dispute Resolution (SPIDR) Law and Public Policy Committee, *Mandated Participation and Settlement Coercion: Dispute Resolution as It Relates to the Courts* (1991) (SPIDR Report on Court-Mandated ADR)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Principles Concerning Qualifications* (1989) (SPIDR Principles)

Task Force on Alternative Dispute Resolution in Employment, *A Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* (1995) (Employment Due Process Protocol)

*Uniform Arbitration Act* , 7 U.A.A. 1 (1997) (Uniform Arbitration Act)

**PRINCIPLE 1. FUNDAMENTALLY-FAIR PROCESS**

*All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.*

Reporter's Comments

Users of ADR are entitled to a process that is fundamentally fair. Emerging standards governing consensual and court-connected ADR programs reflect pervasive concerns with fair process. *See, e.g.,* III Ian R. Macneil, Richard E. Speidel, & Thomas J. Stipanowich, *Federal Arbitration Law: Agreements, Awards & Remedies Under the Federal Arbitration Act* '32.2.1 (1994) [hereinafter *Federal Arbitration Law* ] (noting "universal agreement" that arbitrators must provide parties with fundamentally-fair hearing). *See also Kaiser Permanente Review and Recommendations 1*

("As the sponsor of a mandatory system of arbitration, Kaiser Permanente must assure a fair system to their members, physicians and staff.")

Where conflict resolution processes are defined by a written contract, that writing is often viewed by courts as the primary indicator of the "procedural fairness" for which the parties bargained. As the Advisory Committee recognized, however, ADR agreements in most Consumer contracts are "take-it-or-leave-it" contracts which are not products of negotiation by Consumers. *See* David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration* , 1997 Wis. L. Rev. 33, 55-60 (discussing adhesion dimension of pre-dispute arbitration agreements in standardized contracts); *Kaiser Permanente Review and Recommendations 28 (noting that many members of a major HMO have no realistic alternative for medical care).* It is possible, therefore, that contracts to which they have generally assented contain ADR Agreements which fall so far short of Consumers' reasonable expectations that they would not have entered into the agreement had they been aware of the provisions. Thus, although these Principles attempt to enhance the likelihood that Consumers will have specific knowledge of ADR provisions at the time of contracting, the Advisory Committee also believed it necessary to describe a baseline of reasonable expectations for ADR in Consumer transactions. These Principles identify specific minimum due process standards which embody the concept of fundamental fairness, including: informed consent; impartial and unbiased Neutrals; independent administration of ADR; qualified Neutrals; access to small claims court; reasonable costs (including, where appropriate, subsidized Provider-mandated procedures); convenient hearing locations; reasonable time limits; adequate representation; fair hearing procedures; access to sufficient information; confidentiality; availability of court remedies; application of legal principle and precedent by arbitrators; and the option to receive a statement of reasons for arbitration awards.

Where provisions in a standardized pre-dispute arbitration agreement fail to meet Consumers' reasonable expectations, there is authority for the principle that courts may properly refuse to enforce the arbitration agreement in whole or in part. *See Restatement (Second) of Contracts* ' 211 (1981); *Broemmer v. Abortion Services of Phoenix, Ltd* ., 173 Ariz. 148, 840 P.2d 1013 (1992)(standardized arbitration agreement was unenforceable where its terms fell beyond patient's reasonable expectations); *Graham v. Scissor-Tail, Inc.,* 623 P.2d 165 (Cal. 1981)(arbitration clauses in adhesion contracts are unenforceable if they are contrary to the reasonable expectations of parties or unconscionable). *Cf. Cole v. Burns International Security Services* , 105 F.3d 1465 (D.C. Cir. 1997)(setting forth minimum due process standards for judicial enforcement of arbitration agreement in the context of a statutory employment discrimination claim where the employee was required to enter into the agreement as a condition of employment). Procedural fairness in Consumer arbitration agreements may also be policed under other principles. *See, e.g., Stirlen v. Supercuts* , 51 Cal. App. 4 [th] Supp. 1519, 60 Cal. Rptr.2d 138 (1997)(finding remedial limits in "adhesive" employment agreement unconscionable); *Engalla v. Permanente Med. Grp.,* 938 P.2d 903 (Cal. 1997)(arbitration agreement was unenforceable if there was substantial delay in arbitrator selection contrary to consumer's reasonable, fraudulently induced, contractual expectations).

Because the Principles in this Protocol represent a fundamental standard of fairness, waiver of any of these Principles in a pre-dispute agreement will naturally be subject to scrutiny as to

conformity with the reasonable expectations of the parties and other judicial standards governing the enforceability of such contracts. Assuming they have sufficient specific knowledge and understanding of the rights they are waiving, however, Consumers may waive compliance with these Principles after a dispute has arisen.

## PRINCIPLE 2. ACCESS TO INFORMATION REGARDING ADR PROGRAM

*Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.*

Reporter's Comments

*See SPIDR Report on Qualifications* at 9 ("Consumers are entitled to know what tasks the neutral...may perform and what tasks they are expected to perform in the course of a particular dispute resolution service.") *Cf. SPIDR Principles* at 6-7 ("It is the responsibility of...private programs offering dispute resolution services to define clearly the services they provide...[and provide information about the program and Neutrals to the parties.]"); *Kaiser Permanente Review and Recommendations 28* (provider of medical services has duty to provide users with "enough information and facts to allow them to understand the actual operation of the arbitration system"); *Principles for ADR Provider Organizations 2* . At a minimum, Consumers should be provided with (or have prompt access to) written information to explain the process. This should include general information describing each ADR process used and its distinctive features, including:

> *the nature and purpose of the process, including the scope of ADR provisions;

> *an indication of whether or not the Consumer has a choice regarding use of the process;

> *the role of parties and attorneys, if any;

> *procedures for selection of Neutrals;

> *rules of conduct for Neutrals, and complaint procedures;

> *fees and expenses;

> *information regarding ADR Program operation, including locations, times of operation, and case processing procedures;

> \*the availability of special services for non-English speakers, and persons with disabilities; and,
>
> \*the availability of alternatives to ADR, including small claims court.

*See, e.g., BBB Arbitration Rules* (defining arbitration and the roles of various participants; providing "checklist" for Consumers preparing for arbitration; setting forth procedural rules). *Cf* . *Standards for Court-Connected Programs* ' 3.2.b. (listing information which courts sponsoring mediation should provide to program users). *See also SPIDR Principles* at 6-7 (listing information which private programs should offer to parties regarding the program and participating Neutrals). Consumers should also be able to obtain a copy of pertinent rules and procedures. In the case of binding arbitration provisions, there should also be a straightforward explanation of the differences between arbitration and court process. See Principle 11 "Agreements to Arbitrate." Although the Provider of goods or services is charged with the responsibility for making certain that Consumers have access to appropriate information regarding ADR, the Independent ADR Institution has an important role in this area. The Independent ADR Institution must be prepared to communicate to the parties all information necessary for effective use of the ADR process(es), particularly after a dispute arises.

All materials should be prepared in plain straightforward language. As a rule, such information should be in the same language as the principal contract for goods or services. *See, e.g., N.Y. Pers. Prop. Law* ' 427 (McKinney 1997). *See also Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is monolingual in a particular language, the material should be available in that language.)

Practical Suggestions

An example of a creative approach to providing information about Consumer ADR is provided by a major university medical center's Health Care Dispute Resolution Program. The medical center provides prospective patients with a written explanation of mediation and arbitration procedures for resolution of health care-related disputes one month before they visit the center to complete the remaining paperwork. As the written materials explain, the program is voluntary; patients are not required to opt for the procedures as a condition to receiving treatment. Patients may contact the center for additional information regarding the processes.

For purposes of allowing Consumers access to information about dispute resolution programs, the AAA makes available an 800 customer service telephone number. In addition, the AAA, like some other Independent ADR Institutions, also has a World Wide Web site; it posts its rules and an explanation of its mediation and arbitration procedures on the Web site.

A panel proposing reforms to a major HMO-sponsored arbitration system recommended the creation of an "ombudsperson program to assist members in navigating the system of dispute resolution." *Kaiser Permanente Review and Recommendations 2.43.*

**PRINCIPLE 3. INDEPENDENT AND IMPARTIAL NEUTRAL; INDEPENDENT ADMINISTRATION**

*1. Independent and Impartial Neutral. All parties are entitled to a Neutral who is independent and impartial.*

*2. Independent Administration. If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.*

*3. Standards for Neutrals. The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.*

*4. Selection of Neutrals. The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.*

*5. Disclosure and Disqualification. Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.*

Reporter's Comments

The concept of a fair, independent and impartial Neutral (or Neutral Panel) is enshrined in leading standards governing arbitration and mediation. *See Federal Arbitration Act* ' 10(a)(2); *Uniform Arbitration Act* ' 12(a)(2); *AAA Commercial Rules* 12, 13, 14, 19; *BBB Arbitration Rules* 6, 8. *The Joint Standards for Mediators* describe mediator impartiality as "central" to the mediation process and require mediators to conduct mediation in an impartial manner. *Joint Standards for Mediators*, Art. II; *Standards for Court-Connected Programs* ' 8.1.a. Similar policies animate standards requiring mediators to disclose conflicts of interest and to conduct the mediation in a fair manner. *Joint Standards for Mediators*, Arts. III, VI; *SPIDR Principles*, Principles 4.b., c., f.; 6.d., e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

When Neutrals are appointed by a court or other organization, the appointing entity has an important obligation to ensure their impartiality. This obligation entails a reasonable level of oversight of Neutral performance. Comments to the *Joint Standards for Mediators* indicate that "[w]hen mediators are appointed by a court or institution, the appointing agency shall make reasonable efforts to ensure that mediators serve impartially." *Joint Standards for Mediators*, Art. II. The *Standards for Court-Connected Programs* therefore require courts to "adopt a code

of ethical standards for mediators [covering, among other things, impartiality and conflict of interest], together with procedures to handle violations of the code." *Standards for Court-Connected Programs* ' 8.1. For these and other reasons, the integrity and impartiality of the administrative organization is also important; the growing use of arbitration and mediation in the Consumer context has also raised issues regarding the administration of such processes. *See, e.g., Engalla v. Permanente Med. Grp.,* 928 P.2d 903 (Cal. 1997). *See generally* Edward Dauer, *Engalla's Legacy to Arbitration* , ADR Currents, Summer 1997, at 1; *Principles for ADR Provider Organizations* (setting forth general principles of responsible practice for ADR Provider Organizations, "entities which hold themselves out as offering, brokering or administering dispute resolution services").

In addition to appointing Neutrals, administering institutions often perform many functions which have a direct impact on the conduct of the dispute resolution process, including functions sometimes performed by Neutrals. The consensus of the Advisory Committee was that the reality and perception of impartiality and fairness was as essential in the case of Independent ADR Institutions as it was in the case of individual Neutrals. Thus, the Advisory Committee concluded that when an ADR Agreement mandates that parties resort to mediation or arbitration, the administering Independent ADR Institution should be independent of either party and impartial . *See, e.g., Kaiser Permanente Review and Recommendations 31* (recommending, first and foremost, the "creation of an independent, accountable administrator" for the Kaiser Permanente arbitration system to counter "perception of bias" raised by "self-administration"). *See also Principles for ADR Provider Organizations* (draft standards for organizations providing ADR services). For this and other reasons, this Principle may be the single most significant contribution of the Protocol. In the long term, moreover, the independence of administering institutions may be the greatest challenge of Consumer ADR.

Broad disclosure of actual or potential conflicts of interest on the part of prospective Neutrals is critical to the real and perceived fairness of ADR. Although consenting parties have considerable freedom to choose Neutrals, including those with experience in a particular industry or profession, the key to informed consent is broad disclosure by prospective Neutrals. Therefore, a long line of authority under federal and state arbitration statutes establishes the principle that an arbitrator's failure to disclose certain relationships or other facts which raise issues of partiality may result in reversal of an arbitration award. *See generally* III *Federal Arbitration Law* Ch. 28 (discussing legal and ethical rules governing arbitrator impartiality). The principle of disclosure is embodied in leading arbitration rules and ethical standards. *See AAA Commercial Rule* 19, *NASD Code* ' 10312; *BBB Arbitration Rules* 6, 8.

The *Joint Standards for Mediators* mandate disclosure of "all actual and potential conflicts of interest reasonably known to the mediator" including any "dealing or relationship that might create an impression of possible bias." *Joint Standards for Mediators*, Art. III. Thereafter, the mediator must await the parties' agreement to proceed with mediation. The same concerns require mediators to identify and avoid conflicts during (and even after) mediation. *Id. Cf. Employment Due Process Protocol* ' C.4. (mediators and arbitrators have a duty to disclose any relationship which might reasonably constitute or be perceived as a conflict of interest); *SPIDR Principles* , Principles 4.b., c., f.; 6.d.,e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

Although they did not establish it as a requirement under these Principles, most members of the Advisory Committee endorsed the concept of a "list selection" process similar to that employed by the AAA. *See AAA Commercial Rule* 14. Under this process, the Independent ADR Institution provides each of the parties with lists of prospective Neutrals and invites the parties to identify and rank acceptable individuals. Mutually acceptable Neutrals are thereby identified. The AAA approach served as the model for other ADR standards. *See, e.g., Employment Due Process Protocol* ' C.3.; Securities Industry Conference on Arbitration, *List Selection Rule* (Final Draft, Sept. 18, 1997)(proposed by SICA as modification to Section 8 of the *Uniform Code of Arbitration* ); Proposed Rule Change by National Association of Securities Dealers, File No. SR-NASD097 (proposed by NASD as modification to Rules 10310 and 10311 of the NASD Code of Arbitration Procedure). The concern was expressed that the list selection approach may create a financial tie between Neutrals in the pool and Providers, who will be "repeat players" in the ADR Program. Such considerations may mandate, among other things, a larger panel of Neutrals, rotating assignments, or disclosure of past awards rendered by arbitrators.

In the interest of informed selection, the Advisory Committee recommends that parties be provided with or have access to some information regarding recent ADR proceedings conducted by prospective Neutrals. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection).

The dictates of fairness also extend to the conduct of ADR sessions. Thus, for example, arbitrators generally are forbidden from communicating with parties outside of hearings. *See* III *Federal Arbitration Law* ' 32.4. Similarly, standards for mediator conduct demand impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1.

Although the rules and procedures of an ADR Program and oversight by the Independent ADR Institution are important in assuring the impartiality of Neutrals, it is also essential that Neutrals be bound to perform in accordance with recognized ethical standards. In the case of arbitrators, the leading ethical standard is the *Code of Ethics for Arbitrators in Commercial Disputes* (current version). Similarly, ethical standards governing mediator eligibility also require impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1. It is the responsibility of the Independent ADR Institution to develop or adopt ethical standards for Neutrals and to ensure that Neutrals understand and conform to applicable standards.

Some arbitration procedures provide for a "tripartite" panel in which each party appoints its own "party-arbitrator," and the two party-arbitrators select a third arbitrator to complete the panel. *See generally* III *Federal Arbitration Law* ' 28.4; *see also* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 505-08 (1997)(noting problems with party-arbitrator concept). For a number of reasons, the Advisory Committee believed such practices should be avoided in the Consumer sphere, and that all arbitrators should be neutral. *Cf. Kaiser Permanente Review and Recommendations* 42 (expressing serious concerns regarding tripartite panel approach).

Practical Suggestions

Independent ADR Institutions should develop procedures which are appropriate to each of the ADR Programs they administer. A helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. *Cf. Kaiser Permanente Review and Recommendations* 32 (recommending "on-going, volunteer Advisory Committee" comprised of representatives of various interest groups, including "an appropriate consumer advocacy organization" to consult in development of arbitration program). Such entities should provide a forum in which representatives of Consumers and Providers cooperate in the development and implementation of policies and procedures governing an ADR program, including selection of Neutrals.

For selection of Neutrals, the Independent ADR Institution might utilize a list procedure similar to that used by the AAA. The list of prospective Neutrals should include pertinent biographical information, including the names of parties and representatives involved in recent arbitration proceedings handled by the prospective Neutral. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection). Each party should be afforded discretion to reject any candidate with or without cause. Failing agreement on a Neutral or panel of Neutrals in this fashion, the Neutral should be appointed by the Independent ADR Institution, subject to objection for good cause.

## PRINCIPLE 4. QUALITY AND COMPETENCE OF NEUTRALS

*All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.*

Reporter's Comments

Organizations providing ADR services for Consumer transactions should have a continuing obligation to monitor the quality of the services they provide. This obligation requires that they establish and maintain standards for Neutrals within the program which is appropriate to the issues or disputes being addressed. The SPIDR Commission on Qualifications calls upon private as well as public programs offering ADR services to set and monitor program performance. *See SPIDR Principles*, Principle 6, at 3-4. Likewise, the *Standards for Court-Connected Programs* call upon courts to "ensure that the mediation programs to which they refer cases are monitored adequately...and evaluated [periodically]." *Standards for Court-Connected Programs* ' 6.0.

The most critical element in ADR quality control is the establishment and maintenance of standards of competence for Neutrals within the program. "Competence" refers to "the acquisition of skills, knowledge and...other attributes" deemed necessary to assist others in resolving disputes in a particular setting. *See SPIDR Report on Qualifications* at 6. In 1989, the SPIDR Commission on Qualifications published a list of general skills and areas of knowledge that should be considered by groups establishing competency standards. *See SPIDR Principles*, Principle 11, at 4-7.

While ensuring the competence of Neutrals is always important, it is particularly "critical in contexts where party choice over the process, program or neutral is limited" a reality of many Consumer ADR programs. *See SPIDR Report on Qualifications* at 5; *SPIDR Principles*, Principle 3 at 2 (extent to which Neutral qualifications are mandated should vary by degree of choice parties have over dispute resolution process, ADR Program, and Neutral). The SPIDR Commission on Qualifications requires private programs to, among other things, establish clear criteria for the selection and evaluation of Neutrals and conduct periodic performance evaluations. *SPIDR Principles* at 3. *See also SPIDR Report on Qualifications* at 6 (Neutrals, professional associations, programs and Consumers should all have responsibility for addressing and assessing Neutral performance); American Bar Ass'n Young Lawyers Div. & Special Comm. On Alternative Means of Dispute Resolution, *Resolving Disputes: An Alternative Approach, A Handbook for Establishment of Dispute Settlement Centers* 32 (1983) (noting importance of post-mediation evaluation by administering agency).

The Advisory Committee concluded that it would be inappropriate (and, probably, impossible) to set forth a set of universally applicable qualifications for Neutrals in Consumer disputes. The Advisory Committee's conclusions parallel those of other groups establishing broad standards for the conduct of ADR. *See, e.g.*, *SPIDR Report on Qualifications; SPIDR Principles* at 1, 2. As the SPIDR Commission on Qualifications determined, Neutral qualifications are best established by joint efforts of concerned "stakeholders" in specific contexts. *See, e.g., Kaiser Permanente Review and Recommendations* 35-36 (recommending involvement of advisory committee in development of arbitrator qualifications).

It is important for Consumers to have a voice in establishing and maintaining standards of competence and quality in ADR programs. The SPIDR Commission on Qualifications recently observed that "consumers...share a responsibility with programs, [Neutrals]...and associations to join in evaluating and reporting on the performance of [Neutrals]...and programs and contributing to the development of policies and standards on qualifications." *SPIDR Report on Qualifications*, ' G.2. at 9. *See also SPIDR Principles*, Principle 2 at 2 (private entities making judgments about neutral qualifications should be guided by groups that include representatives of consumers of services). Although Neutral expertise is traditionally a hallmark of arbitration, technical or professional experience often carries with it the perception if not the reality of bias. From the Consumer's perspective, therefore, an arbitrator who shares the professional or commercial background of a Provider may not be the ideal judge. *See, e.g.* , *Broemmer v. Abortion Serv. of Phoenix* , 840 P.2d 1013 (Ariz. 1992)(adhesion arbitration agreement provided by abortion clinic which, among other things, required arbitrator to be a licensed obstetrician/gynecologist, was unenforceable as beyond reasonable expectations of patient).

An Independent ADR Institution's responsibility for the qualifications of Neutrals in a particular Consumer ADR program dictates the development of an appropriate training program. Ideally, the training should include a mentoring program with experienced Neutrals as well as coverage of applicable principles of Consumer law. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 315 (arbitrators need special legal expertise to address statutory issues respecting consumer claims against financial institutions). Successful completion of such

training should be reflected in the information on prospective Neutrals furnished to the parties prior to selection. *Cf. Employment Due Process Protocol* ' C.2.

The Advisory Committee generally supports the concept of broad choice in selection of Neutrals, and recognizes the right of Consumers and Providers to jointly select any Neutral in whom the parties have requisite trust, even one who does not possess all of the qualifications recommended by an ADR Program. *Cf. Employment Due Process Protocol* ' C.1.; *Standards for Court-Connected Programs* ' 13.4 ("Parties should have the widest possible latitude in selecting mediators, consistent with public policy."). This assumes, of course, that both parties have a true choice in the matter, that they are duly informed about the background and qualifications of the Neutrals proposed, and that all such Neutrals have made full disclosure of possible conflicts of interest in accordance with Principle 3.

Practical Suggestions

Elements of effective quality control include the establishment of standards for Neutrals, the development of a training program, and a program of ongoing performance evaluation and feedback. Because the requirements of parties will vary with the circumstances, it will be necessary to establish standards for Neutrals in an ADR Program with due regard for the specific needs of users of the program. As noted in connection with Principle 3, a helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. Such entities could bring Consumer and Provider representatives together to assist in the development and implementation of programs to train, qualify and monitor the performance of Neutrals.

## PRINCIPLE 5. SMALL CLAIMS

*Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.*

Reporter's Comments

Disputes arising out of Consumer transactions often involve relatively small amounts of money. Such disputes may be well-suited to resolution by informal ADR processes and judicial small claims procedures.

Within the judicial system, the least expensive and most efficient alternative for resolution of claims for minor amounts of money often lies in small claims courts. These courts typically provide a convenient, less formal and relatively expeditious judicial forum for handling such disputes, and afford the benefit, where necessary, of the coercive powers of the judicial system. The Advisory Committee concluded that access to small claims tribunals is an important right of Consumers which should not be waived by a pre-dispute ADR Agreement.

<u>Practical Suggestions</u>

Because, for cases involving small amounts of money, parties retain the option of an oral hearing in small claims court, it may be reasonable for the ADR Agreement to provide for arbitration of small claims without a face-to-face hearing. Such alternatives may include "desk arbitration," which involves the making of an arbitration award based on written submissions; proceedings conducted by telephone or electronic data transmission; and other options. *See* Principle 12.

Mediation conducted by telephone conference call has also proven effective in resolving Consumer disputes. At least one major auto manufacturer has successfully used this technique to resolve warranty claims.

## PRINCIPLE 6. REASONABLE COST

*1. Reasonable Cost. Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.*

*2. Handling of Payment. In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.*

<u>Reporter's Comments</u>

A fundamental principle of our civil justice system is that a person should never be denied access to a court due to an inability to pay court costs. The reality is that the public justice system is heavily subsidized, and that users pay only a small fraction of the actual cost of trial and related procedures. Moreover, indigent litigants may be afforded relief from even these small fees. This principle has been extended in many cases to court-connected ADR programs, in which courts defray all or part of the expenses of mediation or court-connected arbitration. *See Standards for Court-Connected Programs*, " 5.1.a, 13.0 ("[c]ourts should impose mandatory attendance only when the cost of mediation is publicly funded"; "[c]ourts should make mediation available to parties regardless of the parties' ability to pay"). According to data from the National Center for State Courts' ADR database, approximately 60% of programs did not depend upon the parties to pay mediator fees for contract and tort cases; no programs charged user fees for mediation of small claims. *See Standards for Court-Connected Programs* ' 13.2., Commentary, at 13-4.

Similar policies have prompted various private ADR tribunals to institute mechanisms for waiving filing fees and other administrative expenses in appropriate cases. *See, e.g., NASD Code* ' 10332 (permitting Director of Arbitration to waive fees or deposits for parties in securities arbitration); *Nazon v. Shearson Lehman Bros., Inc.,* 832 F. Supp. 1540, 1543 (S.D. Fla. 1993)(employee, although required to bear expenses of pursuing civil rights claim in arbitration, might seek waiver of fees under NASD rules). One federal court of appeals recently concluded that to be enforceable with respect to actions under statutes governing employment discrimination, an arbitration agreement must not "require employees to pay either unreasonable

costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum*." Cole v. Burns Int'l Security Serv.*, 105 F.3d 1465, 1482-84 (D.C. Cir. 1997).

Due to the wide range of transactions and the equally broad spectrum of conflict in the Consumer arena, it is inappropriate to mandate bright-line rules regarding ADR costs. In determining what is reasonable, consideration should be given to the nature of the conflict (including the size of monetary claims, if any), and the nature of goods or services provided. In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6. Abbreviated procedures may be particularly appropriate in the context of small monetary claims, where there is always the alternative of a face-to-face hearing in small claims court. *See* Principle 5.

In some cases, the need to ensure reasonable costs for the Consumer will require the Provider of goods or services to subsidize the costs of ADR which is mandated by the agreement. Indeed, many companies today deem it appropriate to pay most or all of the costs of ADR procedures for claims and disputes involving individual employees. *See* Mei L. Bickner, et al, *Developments in Employment Arbitration*, 52 Disp. Res. J. 8 (1997). The consensus of the Committee was that if participation in mediation is mandated by the ADR agreement, the Provider should pay the costs of the procedure, including mediator's fees and expenses. The Committee considered, and ultimately rejected, the alternative of establishing specific requirements for Provider subsidization of the cost of arbitration procedures, other than to conclude that the Provider of goods and services should ensure the consumer a basic minimum arbitration procedure appropriate to the circumstances.

In some cases, an arbitrator may find it appropriate to defray the cost of Consumer participation in arbitration by an award of costs. Some lemon laws provide for such relief. *See, e.g., Chrysler Corp. v. Maiocco* , 209 Conn. 579, 552 A.2d 1207 (1989)(applying Connecticut Lemon Law); *Walker v. General Motors Corp* ., 160 Misc.2d 903, 611 N.Y.S.2d 741 (1994)(applying provision of New York Lemon Law permitting "prevailing consumer" to receive award of attorney's fees); *General Motors Corp. v. Fischer* , 140 Misc.2d 243, 530 N.Y.S.2d 484 (1988)(same). In some cases, it may be appropriate for an arbitrator in a Consumer case to render an award of attorney's fees pursuant to statute or in other cases where a court might do so. Without such an award, however, the Committee does not support the proposition that Providers are required to subsidize Consumers' attorney's fees for ADR.

At the same time, there are legitimate concerns that having the Provider pay all or a substantial portion of neutral's fees and expenses may undermine the latter's impartiality. For this reason, as observed in the *Employment Due Process Protocol*, "[i]mpartiality is best assured by the parties sharing the fees and expenses of the mediator and arbitrator." *Employment Due Process Protocol* ' 6. *See also* Stephen J. Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001, 1023 (1996). *But see* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 528 (1997). Therefore, the Advisory Committee concludes that Consumers should have the option to share up to half of the Neutral's fees and expenses. In addition, unless the parties agree otherwise after a dispute arises, the handling of fee

arrangements and the payment of fees should be conducted by the Independent ADR Institution. The latter, "by negotiating the parties' share of costs and collecting such fees, might be able to reduce the bias potential of disparate contributions by forwarding payment to the mediator and/or arbitrator without disclosing the parties' share therein ." *Employment Due Process Protocol* ' 6.

Some ADR Programs serving Consumers are staffed wholly or partly by unpaid volunteers. *See, e.g.*, *BBB Arbitration Rules* at 2. The use of such programs, including community dispute resolution centers, may be a satisfactory means of addressing cost concerns associated with Consumer ADR, particularly in cases involving low stakes. However, concerns have been expressed by some authorities regarding overdependence on volunteer Neutrals. *See Standards for Court-Connected Programs* ' 13.1, Commentary, at 13-2 (warning of dangers of exclusive reliance on volunteers in ADR programs). Care must be taken by those responsible for overseeing such programs to make certain that lower cost does not come at the expense of adequately qualified Neutrals.

Practical Suggestions

In the event that an ADR procedure is mandated by the Provider of goods and services and the Consumer demonstrates an inability to pay all or part of the costs of the procedure, the Provider should front such costs subject to allocation in the arbitration award or mediation settlement.

In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. See, e.g., Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6.

**PRINCIPLE 7. REASONABLY CONVENIENT LOCATION**

*In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.*

Reporter's Comments

The Advisory Committee concludes that ADR proceedings should take place at a location that is reasonably convenient to all parties.

Flexibility in choosing a hearing location is a theoretical advantage of consensual conflict resolution, permitting minimal cost and inconvenience to all parties. On the other hand, location terms may put one party at a great disadvantage, significantly increasing the cost and logistical complexity of dispute resolution. This is particularly true with regard to binding arbitration, which may involve the participation of multiple witnesses as well as the parties and their representatives. *See* III *Federal Arbitration Law* ' 32.8.3.

Typically, contractual agreements which provide that arbitration hearings will be conducted in a particular place are honored by the courts. *See, e.g., Management Recruiters Int'l, Inc. v. Bloor* , 129 F.3d 851 (6 [th] Cir. 1997)(under *Federal Arbitration Act* , forum expectations of parties in arbitration agreement are enforceable, and may not be upset by state law); *Bear Stearns & Co. v. Bennett* , 938 F.2d 31, 32 (2 [nd] Cir. 1991)(noting "prima facie validity" of forum-selection clauses, including those in arbitration agreements); *Snyder v. Smith* , 736 F.2d 409, 419 (7th Cir.), cert. denied, 469 U.S. 1037, 105 S. Ct. 513, 83 L. Ed.2d 403 (1984)(courts must give effect to freely-negotiated arbitration clause in commercial agreement). *See* II *Federal Arbitration Law* ' 24.2.3.4 (discussing *Federal Arbitration Act* ). *Cf. Carnival Cruise Lines, Inc. v. Shute* , 449 U.S.585,111 S.Ct. 1522, 113 L. Ed. 2d 622 (1991)(judicial forum selection clause in terms on cruise ship passenger ticket enforceable); *M/S Bremen v. Zapata Off-Shore Co.* , 407 U.S. 1, 92 S. Ct. 1907. 32 L.Ed.2d (1972)(judicial forum selection clause is prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances).

The same is true of cases where the parties agree to a process for selecting location, such as that provided by the *AAA Rules*. *See, e.g., AAA Commercial Rule* 11. There is authority for pre-award challenges to location selection mechanisms. *Aerojet-General Corp. v. AAA* , 478 F.2d 248 (9th Cir. 1973)(pre-award judicial review appropriate where choice of arbitration locale not made in good faith and one or more parties are faced with severe irreparable injury). Again, however, such action is likely to be deemed appropriate only in extreme cases. *See Seguro de Servicio de Salud v. McAuto Systems* , 878 F.2d 5, 9 n.6 (1st Cir. 1989); *S.J. Groves & Sons Co. v. AAA* , 452 F. Supp. 121, 124 (D. Minn. 1978).

Some courts, however, have identified limits on locational designations in judicial forum selection provisions. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 292; David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration* , 1997 Wis. L. Rev. 36, 121 n.366. Forum selection clauses may be overcome if it can be demonstrated that their incorporation in the contract was the result of fraud, undue influence, or an extreme disparity in bargaining power, or if the selected forum is so inconvenient that it would effectively deprive a party of a day in court. *See, e.g., Kubis & Persyk Assoc., Inc. v. Sun Microsystems, Inc* ., 146 N.J. 176, 188-97, 680 A.2d 618, 624-29 (1996)(reviewing cases and recognizing limits on enforceability of forum selection clauses); *Moses v. Business Card Expr., Inc* ., 929 F.2d 1131, 1136-39 (6 [th] Cir.), cert. denied, 502 U.S. 821, 112 S. Ct. 81, 116 L.Ed.2d 54 (1991)(in considering change of venue motion, forum selection clause must be considered along with convenience of parties and witnesses and overall fairness); *Hoffman v. Minuteman Press Int'l, Inc.,* 747 F. Supp. 552 (W.D. Mo. 1990)(denying venue change in accordance with forum selection agreement on basis of extreme hardship and alleged fraud in the inducement); *Cutter v. Scott & Fetzer Co* ., 510 F. Supp. 905, 908 (E.D. Wis. 1981)(refusing to enforce forum selection clause on basis of state Fair Dealership Law, and observing that clause was not the subject of negotiation). *See also Restatement (Second) of Conflict of Laws* ' 80 (1969)(agreement regarding place of action will be given effect unless it is unfair or unreasonable); Benjamin Levin & Richard Morrison, Kubis *and the Changing Landscape of Forum Selection Clauses,* 16 Franchise. L.J. 97 (1997)(discussing trend to limit enforceability of forum selection clauses in franchise agreements by statute and

case law); Donald B. Brenner, *There is a Developing Trend Among Courts of Making Choice of Forum Clauses in Franchise Agreements Presumptively Invalid* , 102 Com. L.J. 94 (1997)(same).

In the course of finding a judicial forum selection provision in a form franchise agreement presumptively invalid, the New Jersey Supreme Court recognized that the following factors may be relevant to enforceability: (1) whether the provision is the product of arm's length negotiations or is effectively imposed by a party with disproportionate bargaining power; and (2) whether the provision provides an "indirect benefit to...[the stronger party by making] litigation more costly and cumbersome for economically weaker...[parties] that often lack the sophistication and resources to litigate effectively a long distance from home." *Kubis* , 146 N.J. at 193-94, 680 A.2d at 626-27. *See also Model Choice of Forum Act* ' 3(4) Comment (1968)("A significant factor to be considered in determining whether there was an abuse of economic power or other unconscionable means' [sufficient to deny enforcement to a forum selection clause] is whether the choice of forum agreement was contained in an adhesion, or take-it-or-leave-it' contract.").

Such considerations may also affect the enforceability of an agreement to arbitrate. *See Patterson v. ITT Consumer Financial Corp.,* 14 Cal. App. 4 [th] , 1659, 18 Cal. Rptr.2d 563 (1993)(arbitration provisions in loan agreements requiring California consumers to arbitrate in Minnesota were unconscionable).

Similar concerns have led some states to enact laws placing geographical limitations on the situs of arbitration. *See, e.g.* , *Hambell v. Alphagraphics Franchising Inc.,* 779 F. Supp. 910 (E.D. Mich. 1991)(provision in franchise agreement for arbitration to take place outside state is void and unenforceable under Mich. Stat. Ann. ' 19.854(27)(f)(1984)); *Donmoor, Inc. v. Sturtevant* , 449 So.2d 869 (Fla. Ct. App. 1984)(clause in contract providing for arbitration in another state is unenforceable). Of course, such laws may be preempted by federal substantive law within the scope of the *Federal Arbitration Act* . *See* Levin & Morrison, *supra* , at 115-16.

In light of concerns such as the foregoing which are also relevant in the consumer arena, the Advisory Committee concluded that contractual ADR provisions should include a commitment to conduct ADR at a "reasonably convenient location." Some members of the Advisory Committee favored setting an arbitrary mileage limit (i.e. "no more than 50 miles from the place where the transaction occurred") while others advocated the nearest large city. Others pointed out that parties sometimes relocate. There was general agreement, however, that an agreed-upon process for independent determination of the locale if the parties fail to agree would be fair and equitable to both parties. *See, e.g., AAA Rule* 11; *Uniform Code of Arbitration* ' 9; *NASD Code of Arbitration Procedure* ' 10315. A similar function may be performed by the arbitrator or other duly appointed Neutral. (The *AAA Rules* already accord arbitrators the authority to set specific sites for arbitration hearings. *See AAA Rule* 21.)

In many cases, it may be possible to minimize the need for long distance travel and attendant expenses through the use of telephonic communications and submission of documents. An example of the application of such devices is the Expedited Procedures of the *AAA Rules* , which are generally applied to claims of $50,000 or less. *See AAA Rules* 9, 53-57. *See also Uniform Code of Arbitration* ' 2. Telephonic mediation has long been a feature of some lemon law

programs, and is currently being used in Consumer ADR by the National Futures Association (NFA). The National Association of Securities Dealers (NASD) is currently conducting a pilot program utilizing telephonic mediation.

Recent projects sponsored by the Better Business Bureau, the American Arbitration Association, and other organizations suggest the possibilities of online conflict resolution for online transactions as well as other kinds of disputes. *See generally* George H. Friedman, *Alternative Dispute Resolution and Emerging Online Technologies: Challenges and Opportunities*, 19 Hastings Comm. & Ent. L.J. 695 (1997).

If, as proposed, Consumers have the alternative of pursuing relief in a small claims court of competent jurisdiction, many concerns associated with long distance travel will be obviated with regard to small claims.

Practical Suggestions

Unless a convenient location can be specifically identified in the ADR agreement, the location should be left to the agreement of the parties after a dispute has arisen. The rules governing ADR under the agreement should establish a process for determination of the location by an independent party (such as a Neutral or the Independent ADR Institution) if the parties cannot agree on a location.

In some cases, it may be reasonable to conduct proceedings by telephone or electronic data transmission, with or without submission of documents. *See, e.g.,* Principle 12. Such options may be particularly desirable in the case of arbitration of small claims, since the parties have the choice of going to small claims court. *See* Principle 5.

**PRINCIPLE 8. REASONABLE TIME LIMITS**

*ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.*

Reporter's Comments

A primary impetus for conflict resolution outside the court system is the potential for relatively speedy and efficient resolution of disputes. From the Consumer's perspective, moreover, the expectation of a reasonably prompt conclusion is likely to be, along with cost savings, the leading perceived advantage of consensual mediation or arbitration. *See Madden v. Kaiser Foundation Hospitals*, 17 Cal.3d 699, 711, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976)(speed and economy of arbitration, in contrast to the expense and delay of jury trial, could prove helpful to all parties).

The principle of relatively prompt, efficient conflict resolution underlies standards governing the conduct of Neutrals. Mediators are admonished that "[a] quality process requires a commitment

by the mediator to diligence...." *Joint Standards for Mediators*, Art. VI. The *Joint Standards for Mediators* also comment that "[m]ediators should only accept cases when they can satisfy the reasonable expectations of the parties concerning the timing of the process." *Id.*

A basic requirement is that the rules governing ADR establish and further the basic principle of conflict resolution within a reasonable time. This means not only that the rules should set forth specific time periods for various steps in the ADR process, but that default rules come into play if a party fails to participate in the manner required by the rules after due notice. This principle is embodied in leading ADR standards, including the *AAA Commercial Rules*. *See, e.g.,* Rules 6, 8, 11, 13, 14, 15, 21, 35, 36, 41. *See also BBB Arbitration Rule* 27 ("BBB shall make every effort to obtain a final resolution of your complaint within 60 days, unless state or federal law provides otherwise. This time period may be extended at the request of the customer.").

Of course, it is not enough that the agreement places strict time limitations on procedural steps if these limitations are not effectively enforced a likely occurrence when an ADR Program is not independent of the Provider. Extreme disparity between stipulated time limits and actual practice under arbitration rules may render an arbitration agreement unenforceable, as discussed at length in a recent California Supreme Court decision. *See generally Engalla v. Permanente Med. Grp., Inc.,* 938 P.2d 903 (Cal. 1997). The court pointedly observed,

[M]any large institutional users of arbitration, including most health maintenance organizations (HMO's), avoid the potential problems of delay in the selection of arbitrators by contracting with neutral third party organizations, such as the American Arbitration Association (AAA). These organizations will then assume responsibility for administering the claim from the time the arbitration demand is filed, and will ensure the arbitrator or arbitrators are chosen in a timely manner.

*Id.* at 975-76. In response to this decision, Kaiser appointed an advisory panel to propose reforms to its arbitration program. *See Kaiser Permanente Review and Recommendations 33-34* (recommending establishment of and adherence to stated arbitration process deadlines).

Similarly, courts interpreting state lemon laws have acknowledged the right of Consumers to forgo arbitration and sue in court when the statutory period for the lemon law remedy elapsed without a remedy through no fault of their own. *See, e.g., Harrison v. Nissan Motor Corp.,* 111 F.3d 343 (3 rd Cir. 1997)(court suit permissible where BBB failed to conduct arbitration within stipulated period); *Ford Motor Co. v. Ward* , 577 So.2d 641 (1991)(Consumer not required to exhaust arbitration procedures before bringing suit where dealer made it impossible for Consumer to arbitrate).

Practical Suggestions

When a Consumer dispute involves a small amount of money and relatively straightforward issues, it is reasonable to assume that an out-of-court resolution of such issues should be relatively quick. In such cases, it may be appropriate to develop expedited procedures and to set outside time limits on ADR Processes. Thus, for example, "Fast Track" arbitration procedures for construction disputes provide that "[t]he arbitration shall be completed by settlement or

award within sixty (60) days of confirmation of the arbitrator's appointment, unless all parties agree otherwise or the arbitrator extends this time in extraordinary cases . . . ." *AAA Construction Procedures*, ' F-12. The rules also require the award to be rendered within seven days from the closing of the hearing. *See id.,* ' F-11.

Similarly, the *AAA Wireless Rules* set forth Fast Track procedures for matters involving less than $2,000 in claims or counterclaims. The Fast Track contemplates a "desk" arbitration procedure involving a hearing on documents; a limit of one seven-day extension on the time to respond to a claim or counterclaim; notice by telephone, electronic mail and other forms of electronic communication and by overnight mail, shortened time limits to select an arbitrator; no discovery except in extraordinary cases; a shortened time limit for rendition of award; and a time standard which sets a goal of 45 days from appointment of the arbitrator to award.

## PRINCIPLE 9. RIGHT TO REPRESENTATION

*All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.*

Reporter's Comments

The right to be counseled by an attorney or other representative is an important one that is frequently reflected in standard rules governing ADR proceedings. *See, e.g.* , *AAA Commercial Rule* 22; *NASD Code* ' 10316; *BBB Arbitration Rule* 9.

The Advisory Committee adapted pertinent provisions of the *Employment Due Process Protocol* . *See Employment Due Process Protocol* ' B.1.

In the interest of full disclosure of potential conflicts of interest on the part of Neutrals, the Advisory Committee recommends that the names and affiliations of lawyers and other representatives of each party be communicated to prospective Neutrals and to all parties prior to selection of Neutrals.

As previously noted, the Advisory Committee recognizes that the cost of legal services should be borne by the parties who are receiving the services, and Providers should not be expected to subsidize the cost of legal representation for Consumers. There may, however, be situations where an arbitrator awards attorney's fees in circumstances where they would be available in court. *See* Commentary to Principle 6.

The Advisory Committee recognizes that the involvement of non-attorney representatives in some forms of binding arbitration has raised issues respecting the unauthorized practice of law. The Committee takes no position regarding these issues.

Practical Suggestions

Although the cost of legal services should be borne by the parties who are receiving the services, Independent ADR Institutions should provide Consumers with information regarding referral services and other institutions which might offer assistance in locating and securing competent spokespersons, such as bar associations, legal service associations, and Consumer organizations.

## PRINCIPLE 10. MEDIATION

*The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.*

Reporter's Comments

The increasing popularity of mediation has been a primary impetus for the revolution in conflict resolution approaches. Mediation describes a range of processes in which an impartial person helps disputing parties to communicate and to make voluntary, informed choices in an effort to resolve their dispute. The rapid growth of mediation may be attributed to its informality, flexibility, and emphasis on the particular needs of disputing parties. For this reason, mediation is uniquely adaptable to a wide spectrum of controversies.

The widespread use of mediation in court-connected programs inspired the development of a set of national standards for such endeavors. *See generally Standards for Court-Connected Programs.*

Parallel developments are occurring in the private sphere. Recently, the leading standard construction industry contract was modified to require mediation as an element in project conflict resolution, necessitating modification of related AAA rules. *See AAA Construction Procedures.*

Advisory Committee members agreed that mediation should be encouraged as a valuable intervention strategy, but differed as to the propriety and reasonableness of Provider-drafted ADR Agreements in Consumer contracts which require Consumers to participate in mediation. Those unopposed to such provisions, a majority of Advisory Committee members, noted that mediation offers significant potential advantages and relatively few risks to participants. Particularly where the Provider subsidizes mediation, they reasoned, the prospective benefits to Consumers far outweigh the costs. Those expressing concerns regarding "mandatory" mediation adhere to the view that the choice to participate in settlement discussions should be made voluntarily, and only after conflict arises. Other concerns relate to the cost of mediation, the quality of mediators, the likelihood that not all disputes will be appropriate for mediation, and the lack of understanding of mediation processes (including an understanding of the role of the neutral intervener) on the part of many Consumers. *Cf. Standards for Court-Connected Programs* ' 5.0 (courts should impose mandatory attendance in court-connected mediation only when the cost of mediation is publicly funded, the mediation program is of high quality, and other requirements are met); *SPIDR Report on Court-Mandated ADR* at 2-3.

Encouragement of the use of mediation involves, among other things, educating Consumers and their attorneys about the process. *See* Principle 2 "Access to Information Regarding ADR

Program." *See also SPIDR Principles* at 6 ("It is the responsibility of...private programs offering dispute resolution services to define clearly the services they provide...[and provide information about the program and neutrals to the parties.]"). At a minimum, Consumers should be provided with (or have immediate access to) written information to explain mediation. As a rule, such information should be in the same language as the principal contract for goods or services. *Cf. Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is non-English-speaking, the material should be available in other languages as well.) *See* Principle 2.

Education of users should also include some treatment of the distinctive styles and strategies employed by mediators. Today, mediators handling commercial disputes sometimes employ a facilitative, non-directive approach to problem-solving; in other situations, a more directive approach may be employed. *See generally* Leonard L. Riskin, *Understanding Mediators' Orientations, Strategies, and Techniques: A Grid for the Perplexed*, 1 Harv. Negotiation L. Rev. 7 (1996)(providing a graphic tool for analyzing mediator approaches). Participants need to decide in advance of selection the approach they want a mediator to adopt. The Independent ADR Institution should advise the parties regarding the possibility of interviewing prospective mediators regarding qualifications and style, and help to arrange such interviews.

Practical Suggestions

As referenced in Principle 5, mediation conducted by telephone conference call has proven to be an effective, economical method of resolving Consumer disputes where in-person mediation may not be feasible.

**SPECIAL PROVISIONS RELATING TO BINDING ARBITRATION**

**PRINCIPLE 11. AGREEMENTS TO ARBITRATE**

*Consumers should be given:*

a. *clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;*
b. *reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;*
c. *notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,*
d. *a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.*

Reporter's Comments

In convening the Advisory Committee which developed this Protocol, the AAA requested that the Committee focus its attention upon due process standards for the conduct of Consumer ADR processes and not directly address the process of forming an agreement to mediate or to arbitrate. Committee deliberations revealed a range of opinions regarding the use of pre-dispute binding arbitration agreements in Consumer contracts. Without taking a position on the appropriateness of such agreements, the Committee developed Principle 11 with the intended purpose of

providing guidance to the AAA and similar Independent ADR Institutions in the development of specific arbitration programs within the context of existing law enforcing pre-dispute arbitration agreements. Within this context, Principle 11 emphasizes the importance of knowing, informed assent to arbitration agreements.

Practical Suggestions

Consumers should have clear and adequate notice of the arbitration provision and basic information regarding the process at the time of assent. The appropriate method of giving notice and providing essential information will vary with the circumstances. For example, electronic transactions involving software licensure agreements require different notice procedures than face-to-face negotiations or paper transactions. In all cases, however, there should be some form of conspicuous notice of the agreement to arbitrate and its basic consequences (including comparison to court process, cost information, etc.). In addition, the Consumer should be given the opportunity to acquire additional information regarding the arbitration process. The latter might be obtainable through a mail or Web site address, an 800 number or other means for Consumers to obtain additional information regarding arbitration rules and procedures (such as a brochure available on request).

The following is an example of a possible notice. Ideally, the "notice box" would be sufficiently prominent in the contract document or electronic record so that a Consumer would readily notice it.

| **NOTICE OF ARBITRATION AGREEMENT:** |
|---|
| This agreement provides that all disputes between you and [PROVIDER] will be resolved by BINDING ARBITRATION . <br><br> You thus GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT). <br><br> *Your rights will be determined by a NEUTRAL ARBITRATOR and NOT a judge or jury. <br><br> * You are entitled to a FAIR HEARING , BUT the arbitration procedures are SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT. <br><br> *Arbitrator decisions are as enforceable as any court order and are subject to VERY LIMITED REVIEW BY A COURT. <br><br> FOR MORE DETAILS , <br><br> *Review Section 6.2 above, OR <br><br> * Check our Arbitration Web Site @ ACMEADR.COM, OR <br><br> * Call 1-800-000-0000 |

Among other things, Consumers should have access to information regarding the initiation of the arbitration process. This may be accomplished, for example, by providing customers with a brochure outlining relevant arbitration procedures. If the Consumer has the option of choosing between arbitration or court process, either at the time of contracting or after disputes have arisen, the timing and means of electing the option should also be clearly stated in the notice.

## PRINCIPLE 12. ARBITRATION HEARINGS

*1. Fundamentally-Fair Hearing. All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision- makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.*

*2. Confidentiality in Arbitration. Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.*

Reporter's Comments

There is universal agreement that parties to arbitration are entitled to a "fundamentally-fair hearing." *See* III *Federal Arbitration Law* ' 32.3.1.1. The language of subsection 1 closely follows the definition of a "fundamentally-fair hearing" set forth in *Bowles Financial Grp., Inc. v. Stifel, Nicolaus & Co* ., 22 F.3d 1010, 1013 (10 [th] Cir. 1994)(applying the *Federal Arbitration Act* ). Beyond these basic requirements, of course, "[a]rbitration need not follow all the niceties of...courts." *Grovner v. Georgia-Pacific Corp*., 625 F.2d 1289, 1290 (5 [th] Cir. 1980). Moreover, the arbitrators have great leeway in conducting hearings, within the bounds of the parties' agreement. *See Federal Arbitration Law*, *supra*, " 32.1., 32.3.1.1.

Although authority is split on whether or not parties are guaranteed a face-to-face hearing before the arbitrators, *see id.* , the Advisory Committee concluded that while in some circumstances fundamental fairness may require a face-to-face hearing, in other cases the requirement may be satisfied by telephonic or electronic communications or submissions of documents. *See, e.g.* , *Construction Arbitration Procedures* ' F-9. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6. In small claims cases, the requirement of these Principles that parties retain the option of going to small claims court may make it reasonable for the ADR agreement to provide alternatives to a face-to-face hearing.

Although confidentiality of hearings may be considered an advantage of arbitration, there is no absolute guarantee of confidentiality. *See id.* , ' 32.6.1. Unlike court proceedings, however, the general public has no right to attend arbitration proceedings; if the parties agree, moreover, attendance at hearings may be severely restricted. *See, e.g.*, *AAA Commercial Rule* 25 (directing arbitrators to "maintain the privacy of the hearings unless the law provides to the contrary").

Likewise, arbitrators should be mindful of evidentiary privileges and confidentiality rights available to its parties under applicable law and have discretion to issue protective orders respecting such rights.

The Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. *See, e.g.,* Alan Scott Rau, *Integrity in Private Judging* , 38 S. Tex. L. Rev. 485, 524-26 (1997)(discussing concerns with "asymmetry of information" regarding arbitrators when one party is an institutional "repeat player," and suggesting need for increased disclosure of information regarding past decisions by an arbitrator); Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 293 (discussing disparity between "repeat players" and consumers with regard to knowledge of prospective arbitrators). Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Committee or a similar advisory group, supported by appropriate independent research efforts.

Practical Suggestions

Because these Principles provide that parties should retain the option of an oral hearing in small claims court (Principle 5), it may be reasonable for the ADR agreement to provide other means for small claims arbitration. Such alternatives may include a "desk arbitration" involving a decision on written submissions, participation in proceedings by telephone or electronic data transmission, and other options.

As is generally the case in commercial arbitration, arbitrators may undertake reasonable means to protect the privacy of the hearing.

## PRINCIPLE 13. ACCESS TO INFORMATION

*No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.*

Reporter's Comments

It is understood that ADR sometimes represents a tradeoff between the concept of full discovery associated with court procedures and the efficiencies associated with minimal pretrial process. A hallmark of binding arbitration is the avoidance of the cost and delay associated with extensive pre-hearing discovery. *See* III *Federal Arbitration Law* ' 34.1. In recent years, however, the notion that arbitration means little or no discovery has moderated due to the widening range of cases submitted to arbitration and the increasing recognition that at least some pre-hearing exchange of information may be necessary and appropriate to meet the due process rights of participants and may in some cases reduce the overall length of the process. *See id.* , Ch. 34. *See*

*also* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. on Disp. Res. 267, 283-84, 311, 314 (arguing that limits on discovery in arbitration hamper consumer claimants).

Addressing statutory disputes arising out of employment relationships, the *Employment Due Process Protocol* states that "[a]dequate but limited pre-trial discovery is to be encouraged and employees [and their representatives] should have access to all information reasonably relevant to mediation and/or arbitration of their claims." *Employment Due Process Protocol* ' B.3. The Committee supports the concept of limiting the exchange of information as much as possible while ensuring that Consumers and Providers each have access to information that is legally obtainable and relevant to their case. In most cases, this means that pre-hearing information exchange will consist of an exchange of documents as directed by the arbitrator, identification of witnesses and a summary of their expected testimony. Arbitrators should have the authority to require additional discovery when necessary, such as requiring the deposition of witnesses unable to appear at the hearing in order to preserve their testimony.

Although information exchange issues which cannot be handled by the agreement of the parties should generally be left to the discretion of the arbitrator, it may be appropriate for advisory groups (including adequate consumer representation) to develop guidelines for information exchange in specific kinds of cases. *See, e.g.,* National Association of Securities Dealers, National Arbitration and Mediation Committee, *Report of the Drafting Subcommittee on The Discovery Guide* , Dec. 3, 1997 Draft.

Some Advisory Committee members also expressed concern about the forced production of privileged documents, and argued that arbitrators should be required to observe established privileges such as the attorney-client privilege and work-product privilege. *See* James H. Carter, *The Attorney-Client Privilege and Arbitration,* ADR Currents, Winter 1996-97, 1. As stated in Principle 12, arbitrators should "carefully consider claims of privilege and confidentiality when addressing evidentiary issues." Such protections may be addressed in the arbitration agreement (including incorporated arbitration procedures), and should be thoroughly treated, along with information exchange issues, in arbitrator training programs.

Practical Suggestions

In many cases, issues relating to information exchange may be addressed by the arbitrator(s) at a preliminary conference. *See, e.g., AAA Wireless Rules* " R-9, R-10. Some rules require that all exhibits be exchanged a certain number of days prior to hearings. *See id.,* R-10.

**PRINCIPLE 14. ARBITRAL REMEDIES**

*The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.*

Reporter's Comments

As a general rule, arbitrators have broad authority to fashion relief appropriate to the circumstances. *See* III *Federal Arbitration Law* ' 36.1.1. Their discretion is limited only by the agreement of the parties and the scope of the submission to arbitration. *See id.,* ' 36.1.2.

There are, however, a number of issues respecting the ability of arbitrators to award certain remedies which would be available in court. For example, although the trend under federal and state law is to acknowledge the authority of arbitrators to award punitive damages, a few state courts still take the opposing view. *See generally Federal Arbitration Law* , *supra* , ' 36.3; Thomas J. Stipanowich, *Punitive Damages and the Consumerization of Arbitration,* 92 Nw. U. L. Rev. 1 (1998). And although courts may award attorney's fees where permitted by statute or by agreement of the parties, or where a party acts vexatiously or in bad faith, there is conflicting authority regarding the ability of arbitrators to take similar action. *See generally Federal Arbitration Law* , *supra* , ' 36.8.

This provision incorporates language similar to that contained in the *Employment Due Process Protocol*, ' C.5. The intent is to make clear that arbitrators deriving their authority from Consumer contracts should enjoy the same authority courts have to fashion relief, including awarding attorney's fees and punitive damages in appropriate cases.

Contractual limitations of damages may limit the authority of arbitrators in the same fashion that they limit judicial remedies. It is possible that an award of damages in excess of a contractual limit would be vacated under pertinent statutory standards or common law principles. *See, e.g., FAA* ' 10(a)(4). *But see* Stipanowich, *Punitive Damages*, *supra,* at 33-36 (discussing public policy limitations on pre-dispute caps on punitive damages).

## PRINCIPLE 15. ARBITRATION AWARDS

1.  *Final and Binding Award; Limited Scope of Review. If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.*
2.  *Standards to Guide Arbitrator Decision-Making. In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.*
3.  *Explanation of Award. At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.*

Reporter's Comments

Review of arbitration awards is very limited under modern arbitration statutes. Courts are very reluctant to vacate awards, or to second-guess the decisions of arbitrators on matters of procedure or substance. *See generally* IV *Federal Arbitration Law*, ch. 40. "Arbitrators can misconstrue contracts, make erroneous decisions of fact, and misapply law, all without having their awards vacated." *See id.*, ' 40.6.1. While some members of the Advisory Committee expressed concerns regarding the current state of the law, it was generally agreed that finality was a primary objective of arbitration and that it would be inappropriate to recommend more rigorous judicial review for Consumer arbitration awards than for other arbitration awards. At the same time, however, the Advisory Committee concluded that the rules should specifically direct arbitrators to follow pertinent contract terms and legal principles. This requirement may have implications for qualifications and training of Neutrals pursuant to Principle 4.

Leading modern arbitration statutes do not require arbitrators to provide a written explanation or give reasons for their awards. *See generally* III *Federal Arbitration Law* ' 37.4.1. Similarly, some leading commercial arbitration rules do not require findings of fact or conclusions of law. *See, e.g., AAA Commercial Rules*. Those supporting "bare" awards argue that a written rationale will make it more likely that courts will inquire into the merits of the award, contrary to policies of finality underlying modern statutes. They also observe that not being required to write an opinion simplifies the arbitral task and permits multi-member arbitration panels, like juries, to agree on a decision without concurring on a rationale. *See id.*

On the other hand, some other commercial arbitration rules call for a statement of the underlying rationale. *See, e.g., CPR Rules for Non-administered Arbitration of Business Disputes*, Rule 13.2. Those supporting awards with written rationales argue that a written rationale encourages more disciplined decision-making and enhances party satisfaction with the result. *See* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 529-39 (1997)(offering arguments in favor of "reasoned" awards). After considering the pros and cons of "reasoned " awards, the Advisory Committee concluded that arbitrators of Consumer disputes should provide at least a brief written explanation if requested to do so by any party.

As noted in the Comments accompanying Principle 12, the Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration (including information regarding arbitration awards) and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Advisory Committee or a similar advisory group, supported by appropriate independent research efforts.

Practical Suggestions

To facilitate requests for reasoned awards, the arbitrator should raise the issue with the parties prior to the arbitration hearing. The matter should be addressed at the preliminary conference if one is conducted.

A DUE PROCESS PROTOCOL FOR MEDIATION AND ARBITRATION OF CONSUMER DISPUTES

Dated: April 17, 1998

Some of the signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations.

| The Honorable Winslow Christian | Ken McEldowney |
|---|---|
| *Co-chair* | Executive Director |
| Justice (Retired) | Consumer Action |
| California Court of Appeal | |

William N. Miller
*Co-chair*
Director of the ADR Unit
Office of Consumer Affairs
Virginia Division of Consumer Protection
Designated by National Association of
Consumer Agency Administrators

David B. Adcock
Office of the University Counsel
Duke University

Steven G. Gallagher
Senior Vice President
American Arbitration Association

Michael F. Hoellering
General Counsel
American Arbitration Association

J. Clark Kelso
Director
Institute for Legislative Practice
University of the Pacific
McGeorge School of Law

Elaine Kolish
Associate Director
Division of Enforcement
Bureau of Consumer Protection
Federal Trade Commission

Robert Marotta
Wolcott, Rivers, Wheary, Basnight & Kelly,
P.C.
Formerly Office of the General Counsel
General Motors Corporation

Robert E. Meade
Senior Vice President
American Arbitration Association

Michelle Meier
Former Counsel for Government Affairs
Consumers Union

Anita B. Metzen
Executive Director
American Council on Consumer Interests

James A. Newell
Associate General Counsel
Freddie Mac

Shirley F. Sarna
Assistant Attorney General-In-Charge
Consumer Frauds and Protection Bureau
Office of the Attorney General
State of New York
Designated by National Association
of Attorneys General

Daniel C. Smith
Vice President and Deputy General Counsel
Fannie Mae

Terry L. Trantina
Member
Ravin, Sarasohn, Cook, Baumgarten, Fisch &
Rosen, P.C.
Formerly General Attorney
AT&T Corp.

Deborah M. Zuckerman
Staff Attorney
Litigation Unit
American Association of Retired Persons

Thomas Stipanowich
*Academic Reporter*
W.L. Matthews Professor of Law
University of Kentucky College of Law

- [AAA MISSION & PRINCIPLES](#)
- [PRIVACY POLICY](#)
- [TERMS OF USE](#)
- [TECHNICAL RECOMMENDATIONS](#)
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED



# Consumer-Related Disputes

## Supplementary Procedures



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/consumer**

Rules Effective September 15, 2005

Fees Effective March 1, 2013

APPENDIX PAGE 070

# Table of Contents

Consumer-Related Disputes Supplementary Procedures . . . . . . . . . . . . . . . . . . . . . 4

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    About the AAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The AAA's Consumer Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Availability of Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Arbitrator's Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Claimant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Respondent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    ADR Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Desk Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Telephone Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    In Person Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Neutral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Case Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    ADR Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    ADR Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Independent ADR Institution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Supplementary Procedures for the Resolution of Consumer-Related Disputes . . 8

    C-1. Agreement of Parties and Applicability . . . . . . . . . . . . . . . . . . . . . . . 8

    C-2. Initiation Under an Arbitration Agreement . . . . . . . . . . . . . . . . . . . . . 8

    C-3. Initiation Under a Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C-4. Appointment of Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C-5. Proceedings on Documents ("Desk Arbitration") . . . . . . . . . . . . . . . . 10

    C-6. Expedited Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C-7. The Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C-8. Administrative Fees and Arbitrator Fees . . . . . . . . . . . . . . . . . . . . . . 11

APPENDIX PAGE 071

Costs of Arbitration (including AAA Administrative Fees)* . . . . . . . . . . . . . . . . . . . . 12

(i) Filing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

(ii) Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

(iii) Refund Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

(iv) Hearing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

(v) Hearing Room Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

(vi) Abeyance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

(vii) Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

APPENDIX PAGE 072



# Consumer-Related
## Disputes Supplementary Procedures

## Introduction

Millions of consumer purchases take place each year. Occasionally, these transactions lead to disagreements between consumers and businesses. These disputes can be resolved by arbitration. Arbitration is usually faster and cheaper than going to court. The AAA® applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

### About the AAA

The American Arbitration Association® (AAA) is a not-for-profit, private organization. We offer a broad range of conflict management services to businesses, organizations and individuals. We also provide education, training and publications focused on ways of settling disputes out of court.

### The AAA's Consumer Rules

TThe AAA has developed the Supplementary Procedures for Consumer-Related Disputes for consumers and businesses that want to have their disagreements resolved by arbitrators. People throughout the world can make use of our services.

APPENDIX PAGE 073

### Availability of Mediation

Mediation is also available to help parties resolve their disputes. Mediations are handled under AAA's Commercial Mediation Procedures.

### Administrative Fees

The Association charges a fee for its services under these rules. The costs to the consumer and business depend on the type of hearing and number of arbitrators used. A fee schedule is included at the end of this Supplement.

### Arbitrator's Fees

Arbitrators get paid for the time they spend resolving disputes. The arbitrator's fee depends on the type of proceeding that is used and the time it takes. The business makes deposits as outlined in the fee schedule at the end of this Supplement. Unused deposits are refunded at the end of the case.

# Glossary of Terms

## Claimant

A Claimant is the party who files the claim or starts the arbitration. Either the consumer or the business may be the Claimant.

## Respondent

A Respondent is the party against whom the claim is filed. If a Respondent states a claim in arbitration, it is called a counterclaim. Either the consumer or the business may be the Respondent.

## ADR Process

An ADR (Alternative Dispute Resolution) Process is a method of resolving a dispute out of court. Mediation and Arbitration are the most widely used ADR processes.

## Arbitration

In arbitration, the parties submit disputes to an impartial person (the arbitrator) for a decision. Each party can present evidence to the arbitrator. Arbitrators do not have to follow the Rules of Evidence used in court. Arbitrators decide cases with written decisions or "awards." An award is usually binding on the parties. A court may enforce an arbitration award, but the court's review of arbitration awards is limited.

## Desk Arbitration

In a Desk Arbitration, the parties submit their arguments and evidence to the arbitrator in writing. The arbitrator then makes an award based only on the documents. No hearing is held.

## Telephone Hearing

In a Telephone Hearing, the parties have the opportunity to tell the arbitrator about their case during a conference call. Often this is done after the parties have sent in documents for the arbitrator to review. A Telephone Hearing can be easier than an In Person Hearing.

APPENDIX PAGE 075

## In Person Hearing

During an In Person Hearing, the parties and the arbitrator meet in a conference room or office and the parties present their evidence in a process that is similar to going to court. However, an In Person Hearing is not as formal as going to court.

## Mediation

In Mediation, an impartial person (the mediator) helps the parties try to settle their dispute by reaching an agreement together. A mediator's role is to help the parties come to an agreement. A mediator does not arbitrate or decide the outcome.

## Neutral

A Neutral is a word that is used to describe someone who is a mediator, arbitrator, or other independent, impartial person selected to serve as the independent third party in an ADR process.

## Case Manager

The Case Manager is the AAA's employee assigned to handle the administrative aspects of the case. He or she does not decide the case. He or she only manages the case's administrative steps, such as exchanging documents, matching schedules, and setting up hearings. The Case Manager is the parties' contact point for almost all aspects of the case outside of any hearings.

## ADR Agreement

An ADR Agreement is an agreement between a business and a consumer to submit disputes to mediation, arbitration, or other ADR processes.

## ADR Program

An ADR Program is any program or service set up or used by a business to resolve disputes out of court.

## Independent ADR Institution

An Independent ADR Institution is an organization that provides independent and impartial administration of ADR programs for consumers and businesses. The American Arbitration Association is an Independent ADR Institution.

APPENDIX PAGE 076

# Supplementary Procedures for the Resolution of Consumer-Related Disputes

## C-1. Agreement of Parties and Applicability

**(a)** The Commercial Dispute Resolution Procedures and these Supplementary Procedures for Consumer-Related Disputes shall apply whenever the American Arbitration Association (AAA) or its rules are used in an agreement between a consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. The AAA's most current rules will be used when the arbitration is started. If there is a difference between the Commercial Dispute Resolution Procedures and the Supplementary Procedures, the Supplementary Procedures will be used. The Commercial Dispute Resolution Procedures may be found on our Web site. They may also be obtained from the Case Manager.

**(b)** The Expedited Procedures will be used unless there are three arbitrators. In such cases, the Commercial Dispute Resolution Procedures shall apply.

**(c)** The AAA may substitute another set of rules, such as the Real Estate or the Wireless Industry Arbitration Rules, for the Commercial Dispute Resolution Procedures in some cases.

**(d)** Parties can still take their claims to a small claims court.

## C-2. Initiation Under an Arbitration Agreement

**(a)** The filing party (the "claimant") must notify the other party (the "respondent"), in writing, that it wishes to arbitrate a dispute. This notification is referred to as the "demand" for arbitration. The demand should:

' briefly explain the dispute,
' list the names and addresses of the consumer and the business,
' specify the amount of money involved,
' state what the claimant wants.

The claimant must also send two copies of the demand to the AAA at the time it sends the demand to the respondent. When sending a demand to the AAA, the claimant must attach a copy of the arbitration agreement from the consumer contract with the business. The claimant must also send the appropriate administrative fees and deposits. A fee schedule can be found in Section C-8 at the end of this Supplement.

APPENDIX PAGE 077

**(b)** The AAA shall confirm receipt of the demand to the parties.

**(c)** The respondent may answer the demand and may also file a counterclaim. The answer must be sent to the AAA within ten calendar days after the AAA acknowledges receipt of claimant's demand. The answer must:

' be in writing,
' be sent, in duplicate, to the AAA,
' be sent to the claimant at the same time.
' If the respondent has a counterclaim, it must state the nature of the counterclaim, the amount involved, and the remedy sought.

**(d)** If no answer is filed within the stated time, the AAA will assume that the respondent denies the claim.

**(e)** The respondent must also send the appropriate administrative fees and deposits. A fee schedule can be found in Section C-8 at the end of this Supplement. Payment is due ten calendar days after the AAA acknowledges receipt of claimant's demand.

## C-3. Initiation Under a Submission

Where no agreement to arbitrate exists in the contract between the consumer and the business, the parties may agree to arbitrate a dispute. To begin arbitration, the parties must send the AAA a submission agreement. The submission agreement must:

' be in writing,
' be signed by both parties,
' briefly explain the dispute,
' list the names and addresses of the consumer and the business,
' specify the amount of money involved,
' state the solution sought.

The parties should send two copies of the submission to the AAA. They must also send the administrative fees and deposits. A fee schedule can be found in Section C-8 at the end of this Supplement.

## C-4. Appointment of Arbitrator

Immediately after the filing of the submission or the answer, or after the deadline for filing the answer, the AAA will appoint an arbitrator. The parties will have seven calendar days from the time the AAA notifies them, to submit any factual objections to that arbitrator's service.

## C-5. Proceedings on Documents ("Desk Arbitration")

Where no claims or counterclaims exceed $10,000, the dispute shall be resolved by the submission of documents. Any party, however, may ask for a hearing. The arbitrator may also decide that a hearing is necessary.

The arbitrator will establish a fair process for submitting the documents. Documents must be sent to the AAA. These will be forwarded to the arbitrator.

## C-6. Expedited Hearing Procedures

A party may request that the arbitrator hold a hearing. This hearing may be by telephone or in person. The hearing may occur even if the other party does not attend. A request for a hearing should be made in writing within ten calendar days after the AAA acknowledges receipt of a claimant's demand for arbitration. Requests received after that date will be allowed at the discretion of the arbitrator.

In a case where any party's claim exceeds $10,000, the arbitrator will conduct a hearing unless the parties agree not to have one.

Any hearings will be conducted in accordance with the Expedited Procedures of the Commercial Dispute Resolution Procedures. These procedures may be found on our Web site. They may also be obtained from the Case Manager.

## C-7. The Award

(a) Unless the parties agree otherwise, the arbitrator must make his or her award within fourteen calendar days from the date of the closing of the hearing. For Desk Arbitrations, the arbitrator has fourteen calendar days from when the AAA sends the final documents to the arbitrator.

(b) Awards shall be in writing and shall be executed as required by law.

(c) In the award, the arbitrator should apply any identified pertinent contract terms, statutes, and legal precedents. The arbitrator may grant any remedy, relief or outcome that the parties could have received in court. The award shall be final and binding. The award is subject to review in accordance with applicable statutes governing arbitration awards.

APPENDIX PAGE 079

## C-8. Administrative Fees and Arbitrator Fees

Administrative fees and arbitrator compensation deposits are due from the claimant at the time a case is filed. They are due from the respondent at the time the answer is due. The amounts paid by the consumer and the business are set forth below.

# Costs of Arbitration (including AAA Administrative Fees)*

Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on a rate established by the AAA set forth below. Once the Preliminary Hearing (see R-21 of the Commercial Arbitration Rules) is held by the arbitrator, the arbitrator is entitled to one half the arbitration compensation rate for a full hearing day/or a documents-only hearing. The business shall pay the arbitrator's compensation unless the consumer, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses as defined in sections (v) and (vii) below, and administrative fees (which include Filing and Hearing Fees) are not subject to reallocation by the arbitrator(s) except pursuant to applicable law or upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

> \* Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA at 1-800-778-7879, if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003)

## (i) Filing Fees

In cases before a single arbitrator, a nonrefundable filing fee capped in the amount of $200 is payable in full by the consumer when a claim is filed, unless the parties' agreement provides that the consumer pay less. A partially refundable fee in the amount of $1,500 is payable in full by the business, unless the parties' agreement provides that the business pay more. This fee is due from the business once the consumer has met the filing requirements.

In cases before three or more arbitrators, a nonrefundable filing fee capped in the amount of $200 is payable in full by the consumer when a claim is filed, unless the parties' agreement provides that the consumer pay less. A partially refundable fee in the amount of $2,000 is payable in full by the business, unless the parties' agreement provides that the business pay more. This fee is due from the business once the consumer has met the filing requirements.

There shall be no filing fee charged for a counterclaim.

## (ii) Neutral Arbitrator's Compensation

Arbitrators serving on a case with an in-person or telephonic hearing will receive compensation at a rate of **$1500 per day.**

Arbitrators serving on a case with a desk arbitration/documents-only hearing will receive compensation at a rate of **$750 per case.**

## (iii) Refund Schedule

Once the claimant has met the filing requirements, refunds to the business will be calculated as follows:

- if the case is settled or withdrawn within 30 calendar days, 50% of the filing fee will be refunded to the business.

However, no refund will be made once an arbitrator has been appointed and no refunds will be made on awarded cases. The date the claimant's filing requirements are met is the date used to calculate any refund of filing fees. If the matter is settled or withdrawn prior to receipt of filing fees from the business, the AAA will bill the business in accordance with this refund schedule.

## (iv) Hearing Fees

For telephonic hearings or in-person hearings held, an additional administrative fee of $500 is payable by the business.

There is no AAA hearing fee for the initial Administrative Conference (see R-10 of the Commercial Arbitration Rules).

## (v) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains rental hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the business.

## (vi) Abeyance Fee

Parties on cases held as inactive for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the opposing party or parties may pay the entire fee on behalf of all parties, otherwise the

matter will be administratively closed. All filing requirements, including payment of filing fees, must be met before a matter may be placed in abeyance.

## (vii) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the business.

| PARTIES | DESK ARBITRATION | IN-PERSON OR TELEPHONIC HEARING – SINGLE ARBITRATOR | IN-PERSON OR TELEPHONIC HEARING – THREE OR MORE ARBITRATORS |
|---|---|---|---|
| Consumer | Filing Fee - $200 | Filing Fee - $200 | Filing Fee - $200 |
| Business | Filing Fee - $1500<br><br>Arbitrator Compensation - $750 per case | Filing Fee - $1500<br><br>Hearing Fee - $500<br><br>Arbitrator Compensation - $1500 per hearing day | Filing Fee - $2000<br><br>Hearing Fee - $500<br><br>Arbitrator Compensation - $1500 per hearing day per arbitrator |

APPENDIX PAGE 083

*© 2014 American Arbitration Association®, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

### NO. 03-15-00422-CV

**Shakeel Mustafa, Appellant**

**v.**

**Felix Rippy, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
### NO. 15-0708-CC4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment dated August 21, 2015, and substitute the following opinion and judgment in their place. Appellant's motion for rehearing is dismissed as moot.

Shakeel Mustafa filed a notice of appeal attempting to challenge the trial court's order granting Felix Rippy's motion to compel arbitration.

We do not have jurisdiction to review a trial court's interlocutory order granting arbitration. *See* Tex. Civ. Prac. & Rem. Code § 171.098(a)(1),(2) (authorizing interlocutory appeal of trial court order *denying* application to compel arbitration or granting application to *stay* arbitration) (emphases added); *Mohamed v. AutoNation USA Corp.*, 89 S.W.3d 830, 833-34

(Tex. App.—Houston [1st Dist.] 2002, no pet.) (dismissing interlocutory appeal because "no interlocutory appeal lies from an order granting a motion to compel arbitration under TAA").

On August 4, 2015, this Court requested that Mustafa file a written response demonstrating our jurisdiction over this appeal. No response was filed, and we dismissed the appeal for want of jurisdiction.

Mustafa filed a motion for rehearing contending that we have jurisdiction to review the trial court's interlocutory order denying his motion to compel mediation then arbitration. However, even if the trial court implicitly denied Mustafa's motion to compel mediation before arbitration, we lack jurisdiction to review an interlocutory order denying referral of a matter to mediation. *See In re D.C.*, No. 07-11-00046-CV, 2011 Tex. App. LEXIS 1461, at *3 (Tex. App.—Amarillo Feb. 28, 2011, no pet.) (mem. op.) ("We have no appellate jurisdiction to review an interlocutory order granting or denying referral of a matter to mediation."); *see also* Tex. Civ. Prac. & Rem. Code § 51.014(a) (providing for interlocutory appeals generally).

We dismiss this appeal for want of jurisdiction. *See* Tex. R. App. P. 43.2(f).

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Field

Dismissed for Want of Jurisdiction on Motion for Rehearing

Filed: September 24, 2015

2



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01223-CV

## MICHAEL MORFORD, INDIVIDUALLY, D/B/A NEMAHA WATER SERVICES, GEFFREY ARNOLD MCFALLS, INDIVIDUALLY D/B/A NEMAHA WATER SERVICES, NEMAHA WATER SERVICES, LP, NEMAHA WATER SERVICES GP, LLC, NEMAHA WATER SERVICES OK-1702, LLC, AND NEMAHA SERVICES HOLDING COMPANY, LLC, Appellants
### V.
## ESPOSITO SECURITIES, LLC, Appellee

On Appeal from the 44th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-14-05795

## MEMORANDUM OPINION
Before Justices Fillmore, Stoddart, and Whitehill
Opinion by Justice Stoddart

This is an appeal from an order denying Nemaha's[1] motion to compel arbitration before the Financial Industry National Regulatory Authority (FINRA) and granting Esposito Securities, LLC's motion to compel arbitration before the American Arbitration Association (AAA). In a single issue, Nemaha argues the trial court erred by concluding Nemaha was not a customer

---

[1] Appellants are Michael Morford, Individually, D/B/A Nemaha Water Services, Geffrey Arnold Mcfalls, Individually D/B/A Nemaha Water Services, Nemaha Water Services, LP, Nemaha Water Services GP, LLC, Nemaha Water Services Ok-1702, LLC, and Nemaha Services Holding Company, LLC. We refer to appellants collectively as Nemaha.

under FINRA rules and by denying Nemaha's motion to compel arbitration before FINRA.

We conclude we have appellate jurisdiction over that portion of the order denying Nemaha's motion to compel arbitration, but not over that portion granting Esposito's motion to compel arbitration. Nemaha requests that we treat this appeal as a petition for writ of mandamus if necessary. We grant Nemaha's request and treat the appeal as a petition for writ of mandamus regarding the order granting Esposito's motion to compel arbitration.[2]

We conclude Nemaha is a customer of Esposito, a FINRA member, and entitled to request FINRA arbitration under the rules adopted by FINRA and approved by the Securities and Exchange Commission (SEC) under its Congressionally delegated rulemaking authority. Accordingly, the trial court erred by denying Nemaha's motion to compel arbitration before FINRA and abused its discretion by granting Esposito's motion. We reverse the trial court's order denying Nemaha's motion, render judgment granting Nemaha's motion to compel arbitration, and order all disputes between the parties proceed to arbitration before FINRA pursuant to FINRA rules. We conditionally grant the petition for writ of mandamus as to the portion of the order granting Esposito's motion to compel arbitration and direct the trial court to vacate that portion of the order.

## BACKGROUND

Esposito, a Dallas based firm, is a licensed securities broker and member of FINRA. As a member of FINRA, Esposito agreed to arbitrate disputes with it customers under FINRA rules.[3]

---

[2] Pursuant to rule 7.2(b), we abated this proceeding to allow the successor judge of the trial court to reconsider the order. The judge of the trial court affirmed the order and we reinstated this proceeding.

[3] *See UBS Fin. Services, Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (by joining FINRA, members agree to comply with FINRA rules including FINRA Code of Arbitration); FINRA Code Rule 12200, 2015 WL 464978 ("Parties must arbitrate a dispute under the [FINRA] Code if: Arbitration under the [FINRA] Code is either: (1) Required by a written agreement, or (2) Requested by the customer;" the dispute is between a customer and a member; and the dispute arises in connection with the business activities of the member).

Customers of FINRA members are third party beneficiaries of the agreement to arbitrate[4] and may enforce that agreement pursuant to rules promulgated by FINRA. This case arises out of a letter agreement (Agreement) between Esposito and Nemaha,[5] based in Oklahoma, whereby Esposito agreed generally to assist Nemaha in finding investors or a merger partner in return for a fee of five percent of the total consideration received by Nemaha in a qualifying transaction. The Agreement contains an arbitration provision requiring resolution of all disputes arising out of or relating to the Agreement by binding arbitration according to the rules of the AAA.

Esposito alleged in its statement of claim before the AAA and its petition in this case that it performed a number of services for Nemaha that were accepted by Nemaha and that Nemaha, in breach of the terms of the Agreement, negotiated and closed two transactions without coordinating or communicating with Esposito. When Esposito learned of these transactions, it demanded a fee of five percent of the total consideration received by Nemaha, approximately $410,000. Nemaha refused the demand.

Esposito filed a claim for arbitration with the AAA, but Nemaha refused to participate in the AAA arbitration. Esposito then filed this lawsuit seeking to recover damages for breach of contract or in the alternative, quantum meruit, and filed a motion to compel arbitration before the AAA. In response, Nemaha filed a counterclaim for a declaratory judgment that the transactions did not fall within the description of transactions requiring the payment of a fee under the terms

---

[4] *See id.* ("A customer under the exchange's rules is entitled to invoke the arbitration provision 'as an intended third-party beneficiary' in a dispute with a member.") (quoting *Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863–64 (2d Cir. 1994) (customers are intended beneficiaries of member's agreement to arbitrate pursuant to NASD, predecessor to FINRA, rules)).

[5] The record is unclear whether Nemaha is a separate legal entity or merely an assumed name of the individuals and partnerships named as parties in Esposito's original petition. The Agreement was signed on behalf of Nemaha Water Services by Michael Morford as partner and president. Esposito alleged in its petition and AAA supplemental statement of claim that it entered into the agreement with all of the appellants doing business as Nemaha Water Services. Esposito sought to compel all of the appellants to arbitration as parties bound by the Agreement. Accordingly, we will consider the appellants collectively as a single business and parties to the Agreement as Esposito has done.

of the Agreement. Nemaha also filed a motion to compel arbitration before FINRA and initiated an arbitration proceeding in that forum.

After three hearings on the matter, the trial court signed an order determining that Nemaha was not a customer of Esposito because appellants "have apparently taken the position in their Statement of Claim to FINRA that [Esposito] is not entitled to a transaction fee because the [appellants] have yet to purchase a good or service." The order granted Esposito's motion to compel arbitration and required the parties to arbitrate all claims before the AAA, and impliedly denied Nemaha's cross-motion to compel arbitration before FINRA.

### JURISDICTION

Two jurisdictional issues are presented in this appeal. First is the late filing of the notice of appeal under TEX. R. APP. P. 26(b). Second is our jurisdiction to consider an appeal from an order granting a motion to compel arbitration in one forum and denying a motion to compel arbitration in another forum.

### A. Late Notice of Appeal

The notice of appeal in an accelerated appeal must be filed within 20 days after the judgment or order is signed.[6] The order denying Nemaha's motion to compel FINRA arbitration and granting Esposito's motion to compel AAA arbitration was signed on August 28, 2014. The notice of appeal was due twenty days later on September 17, 2014. Nemaha filed its notice of appeal on September 23, 2014. Although Nemaha filed a motion to reconsider the August 28, 2014 order, that motion did not extend the time for Nemaha to perfect its accelerated appeal.[7]

Nemaha filed a motion to extend the time to file its notice of appeal on September 24,

---

[6] TEX. R. APP. P. 26.1(b).

[7] TEX. R. APP. P. 28.1(b) ("Filing a motion for new trial, any other post-trial motion, or a request for findings of fact will not extend the time to perfect an accelerated appeal.").

2014,[8] and explained:

> Here, the notice of appeal was not filed immediately because it was hoped a motion for reconsideration would resolve the issue without the necessity of appeal. When reconsideration was denied, the deadline to file a Notice of Appeal was inadvertently missed due to a miscommunication between counsel and a miscalculation of the date on which the notice of appeal was due. The delay was not deliberate or intentional, but was the result of inadvertence, mistake or mischance.

Waiting on the outcome of a post-trial motion before perfecting an appeal is not a reasonable explanation of the need for an extension.[9] However, Nemaha's motion for extension, while conclusory and lacking specific facts, explains that the failure to file the notice of appeal was inadvertent due to a miscommunication between counsel and a miscalculation of the date the notice of appeal was due. This explanation is some indication the delay was not deliberate or intentional.[10] The record indicates Nemaha intended to appeal the trial court's ruling and the explanation in the motion for extension does not show a conscious or strategic decision to wait to file the notice of appeal.[11] Accordingly, we grant Nemaha's motion for extension of time to file the notice of appeal.

## B. Jurisdiction of Interlocutory Appeal

Because the contract between the parties evidences a transaction involving commerce, the Federal Arbitration Act (FAA) applies in this case.[12] While the FAA applies to substantive

---

[8] *See* TEX. R. APP. P. 26.3 (motion for extension must be filed within 15 days after deadline for filing notice of appeal).

[9] *See Jahner v. Jahner*, No. 05-15-00225-CV, 2015 WL 1910014, at *1 (Tex. App.—Dallas Apr. 28, 2015, no. pet. h.) (mem. op.) (decision to await outcome of hearing on motion to modify did not constitute reasonable explanation of a need for extension of time to file notice of appeal).

[10] *See Garcia v. Kastner Farms, Inc.*, 774 S.W.3d 668, 669 (Tex. 1989) ("any conduct short of deliberate or intentional noncompliance qualifies as inadvertence, mistake, or mischance").

[11] *See Jahner*, 2015 WL 1910014, at *1.

[12] 9 U.S.C. § 2 (2012); *see In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 779 (Tex. 2006) (noting FAA preempts only contrary state law).

issues, we apply Texas law to procedural matters.[13]

Pursuant to section 51.016 of the civil practice and remedies code, a party may appeal a judgment or interlocutory order in a matter subject to the FAA under the same circumstances as an appeal would be permitted under 9 U.S.C. § 16.[14] FAA section 16 permits appeals from orders denying a petition for an order directing arbitration to proceed.[15] But section 16 prohibits an appeal from an interlocutory order directing arbitration to proceed.[16] Generally, section 16 does not permit interlocutory appeals from orders favoring arbitration.[17]

The order here disposed of cross-motions to compel arbitration by granting Esposito's motion and impliedly denying Nemaha's cross-motion. Under section 16 and section 51.016, we have appellate jurisdiction over the denial of Nemaha's motion to compel arbitration before FINRA. However, the order also granted Esposito's motion to compel arbitration before the AAA.

In *Austin Commercial*, we faced a somewhat similar situation except we were not dealing with competing motions to compel arbitration.[18] Austin Commercial, the general contractor on a construction project, contracted with Carter & Burgess for architectural services.[19] After a dispute arose with Carter & Burgess, Austin Commercial moved to compel arbitration before the Civilian Board of Contract Appeals (CBCA) under its prime contract with the project owner. The subcontract between Austin Commercial and Carter & Burgess required arbitration pursuant to

---

[13] *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex. 1992) (orig. proceeding); *In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 394–95 (Tex. App.—Dallas 2009, pet. denied).

[14] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West 2015); *CMH Homes v. Perez*, 340 S.W.3d 444, 449 (Tex. 2011); *Austin Commercial Contractors, L.P. v. Carter & Burgess, Inc.*, 347 S.W.3d 897, 900 (Tex. App.—Dallas 2011, pet. denied).

[15] 9 U.S.C. § 16(a)(1)(B); *id.* § 4.

[16] *Id.* § 16(b)(2).

[17] *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 86 (2000); *Austin Commercial*, 347 S.W.3d at 900.

[18] *See Austin Commercial*, 347 S.W.3d at 899.

[19] *Id.*

the dispute resolution procedures in the prime contract, but in the absence of such procedures, all disputes would be resolved by AAA arbitration.[20]

Carter & Burgess did not seek arbitration; it opposed arbitration before either forum, arguing the CBCA did not have jurisdiction and Austin Commercial waived arbitration by engaging in litigation before requesting arbitration.[21] The trial court granted the motion to compel in part and denied it in part. The court compelled arbitration, but before the AAA rather than the CBCA.[22] We concluded we did not have appellate jurisdiction over this order under FAA section 16 and section 51.016 of the civil practice and remedies code.[23] However, we also concluded that Austin Commercial was entitled to mandamus relief from the order compelling arbitration before the AAA.[24] We determined Austin Commercial lacked an adequate remedy by appeal and the trial court clearly abused its discretion by compelling arbitration before AAA when the subcontract required arbitration according to the dispute resolution procedures in the prime contract.[25]

Nemaha requests that we consider its appellate brief a petition for writ of mandamus if necessary to review the trial court's order. We may consider an appeal as a petition for writ of mandamus if requested.[26] The requirements for mandamus relief are a clear abuse of discretion and the lack of an adequate remedy by appeal.[27] There is no adequate remedy by appeal when a

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 900.

[24] *Id.* at 901–02.

[25] *Id.*

[26] *See CMH Homes*, 340 S.W.3d at 452–54.

[27] *See Austin Commercial*, 347 S.W.3d at 901 (citing *In re Gulf Exploration, LLC*, 289 S.W.3d 836, 842 (Tex. 2009)).

party is erroneously denied its contracted-for arbitration rights under the FAA.[28]

Following *Austin Commercial*, we conclude we do not have appellate jurisdiction over that portion of the order granting Esposito's motion to compel arbitration.[29] Accordingly, we dismiss that portion of this appeal, but grant Nemaha's request that we treat its appeal as a mandamus petition as to the order granting the motion to compel. If Nemaha is a customer, it has a contractual right as a third party beneficiary to request arbitration under FINRA rules under Esposito's member agreement with FINRA. If that right is erroneously denied by ordering Nemaha to arbitrate before the AAA, Nemaha will lack an adequate remedy by appeal.[30] Thus, we conclude we have mandamus jurisdiction to consider whether the trial court abused its discretion by granting Esposito's motion to compel arbitration before the AAA.[31]

## STANDARD OF REVIEW

A party seeking to compel arbitration has the initial burden of establishing the parties agreed to arbitration and that the claims fall within the agreement's scope.[32] We review an order denying a motion to compel arbitration under an abuse of discretion standard.[33] We defer to the trial court's factual determinations by applying a no-evidence standard of review, but we review the trial court's legal determinations de novo.[34] Whether an arbitration agreement is enforceable is subject to de novo review.[35]

---

[28] *Id.* (citing *In re D. Wilson Constr. Co.*, 196 S.W.3d at 780–81).

[29] *See Austin Commercial*, 347 S.W.3d at 900.

[30] *Id.* at 901.

[31] *Id.*

[32] *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

[33] *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding); *Sidley Austin Brown & Wood, LLP v. J.A. Green Dev. Corp.*, 327 S.W.3d 859, 863 (Tex. App.—Dallas 2010, no pet.).

[34] *Labatt*, 279 S.W.3d at 643; *Sidley*, 327 S.W.3d at 863.

[35] *Labatt*, 279 S.W.3d at 643.

ANALYSIS

## A. FINRA Rules

For many years, FINRA[36] and its predecessor adopted comprehensive rules regarding arbitration between FINRA members and their customers or employees.[37] As discussed above, FINRA members agree to arbitrate with their customers pursuant to the FINRA code and customers are third-party beneficiaries of the arbitration provision in the membership agreement.[38] It is undisputed that Esposito is a member of FINRA.

FINRA Rule 12200 provides:

Parties must arbitrate a dispute under the [FINRA] Code if:

> • Arbitration under the [FINRA] Code *is either*:
>
>> (1) Required by a written agreement, *or*
>>
>> (2) Requested by the customer;
>
> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member . . . .

---

[36] FINRA is a self-regulatory organization (SRO) under Section 15A of the Securities Exchange Act of 1934. 15 U.S.C. § 78*o*-3; *W. Va. Univ. Hosps.*, 660 F.3d at 648. It was created in 2007 through a consolidation of the National Association of Securities Dealers, Inc. (NASD) and the regulatory arm of the New York Stock Exchange Group, Inc. (NYSE). *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011).

[37] In 1975, Congress granted extensive power to the SEC to regulate rules adopted by FINRA and to ensure the adequacy of the arbitration procedures employed by SROs:

> Since the 1975 amendments to § 19 of the Exchange Act, however, the Commission has had expansive power to ensure the adequacy of the arbitration procedures employed by the SROs. No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act, 15 U.S.C. § 78s(b)(2); and the Commission has the power, on its own initiative, to "abrogate, add to, and delete from" any SRO rule if it finds such changes necessary or appropriate to further the objectives of the Act, 15 U.S.C. § 78s(c). In short, the Commission has broad authority to oversee and to regulate the rules adopted by the SROs relating to customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights.

*Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 233–34 (1987).

[38] *W. Va. Univ. Hosps.*, 660 F.3d at 649 ("A customer under the exchange's rules is entitled to invoke the arbitration provision 'as an intended third-party beneficiary' in a dispute with a member.").

FINRA R. 12200, 2015 WL 464978 (emphasis added).

Under the plain language of rule 12200, parties must arbitrate under the FINRA code if FINRA arbitration is required either by a written agreement *or* requested by a customer of a FINRA member.[39] The Agreement here does not provide for FINRA arbitration, but Nemaha, claiming to be a customer of a FINRA member, requested FINRA arbitration. Thus, if Nemaha is a customer of Esposito, an admitted FINRA member, Nemaha is entitled to demand arbitration pursuant to FINRA rules.[40]

The trial court's order indicates the parties and the court agreed that "if Nemaha is [a] 'Customer' of Esposito Securities, then the FINRA rules apply and this Court must send the case to FINRA arbitration per [Nemaha's] request." Thus, as the parties have narrowed the issue, if Nemaha is a customer, the dispute must be submitted to FINRA arbitration as requested by Nemaha, but if Nemaha is not a customer, the dispute should be submitted to AAA arbitration pursuant to the terms of the Agreement.

## B. Customer

The FINRA rules do not define the term "customer" other than by stating that a customer is not a broker or dealer as defined by the Exchange Act.[41] Courts that have considered the meaning of the term agree that "customer" should be given its ordinary meaning of someone

---

[39] "[I]f the rules of an exchange (or similar organization) require arbitration of customer disputes, a broker's membership obligation confers upon the customer an option to arbitrate as the exchange rules provide." *Id.* (quoting *Zinsmeyer*, 41 F.3d at 864); *see also UBS Fin. Services, Inc. v. Carilion Clinic*, 706 F.3d 319, 323 (4th Cir. 2013) (FINRA members are generally required to arbitrate under FINRA rules when such arbitration is requested by customers and the dispute "arises in connection with the business activities of the member").

[40] Citing *Phillips v. ACS Municipal Broker, Inc.*, 888 S.W.2d 872, 875 (Tex. App.—Dallas 1994, no writ), Esposito argues that FINRA rules do not constitute a contract in writing for arbitration. *Phillips* was decided solely under the Texas Arbitration Act and before the legislature granted appellate jurisdiction over arbitration proceedings under the FAA. *See id.* at 874. This case is governed by the FAA and, as discussed above, we have jurisdiction over both the appeal and the mandamus proceeding.

[41] *See* FINRA Rule 12100(i), 2015 WL 464972.

who buys goods or services.[42] Thus, "[t]he term 'customer' includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member."[43] By agreeing to accept a fee for its services, a FINRA member understands it may be compelled to arbitrate any disputes with a party to the agreement.[44]  While this may not be a "comprehensive definition of the term, it captures virtually all customer relationships."[45]

The trial court's order indicates the court believed Nemaha took inconsistent positions in this case and in the FINRA arbitration. The court concluded Nemaha was not a customer because Nemaha took the position in its FINRA statement of claim that it had yet to purchase a service from Esposito. Nemaha's statement of claim, however, does not support this conclusion. Nemaha asserted it was a customer under FINRA Rule 12200 and entitled to arbitrate the dispute with Esposito under FINRA rules.  Specifically, Nemaha alleged the Agreement was fraudulently induced because Esposito failed to disclose that it did not have expertise in obtaining initial capital for startup companies and that the transaction on which Esposito claimed a fee did not fall within the types of transactions described in the Agreement. Nemaha did not deny entering into the Agreement or receiving services from Esposito. Nemaha denied that those services resulted in a transaction for which a fee was due to Esposito under the terms of the Agreement. Thus, we conclude the record does not support the trial court's conclusion that Nemaha is precluded from

---

[42] *Citigroup Global Markets Inc. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014) (citing *W. Va. Univ. Hosps.*, 660 F.3d at 650 (citing several dictionary definitions)); *Carilion Clinic*, 706 F.3d at 325 ("the term 'customer' in Rule 12200 still retains its generally accepted meaning—'one that purchases a commodity or service.'").

[43] *W. Va. Univ. Hosps.*, 660 F.3d at 650; *see Abbar*, 761 F.3d at 275 ("a 'customer' under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member"); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) ("'customer' is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities"), *cert. denied sub nom. City of Reno, Nev. v. Goldman, Sachs & Co.*, 135 S. Ct. 477 (2014); *Carilion Clinic*, 706 F.3d at 325 (a "customer" is "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business.").

[44] *Abbar*, 761 F.3d at 275 (citing *W. Va. Univ. Hosps.*, 660 F.3d at 650).

[45] *Id.*

claiming customer status by its allegations in the FINRA arbitration.

Esposito argues that Nemaha is not a customer because it never "purchased"—that is paid for—the services allegedly provided by Esposito. According to Esposito, a completed purchase or payment is required to become a customer, relying on *Abbar* and *Morgan Keegan*. However, the controlling factor in those cases was not a completed purchase or payment of a fee, but direct dealings between the alleged customer and the member. In *Abbar* and *Morgan Keegan*, the alleged customers did not contract directly with the member to purchase any goods or services. Abbar received services from Citi NY, a FINRA member, but he did not purchase those services from Citi NY because his contracts were with Citi UK and the fee for all services rendered by Citigroup personnel was paid to Citi UK.[46] The Second Circuit affirmed the district court's finding that Abbar was not a customer because "Abbar never held an account with the FINRA member and (notwithstanding his argument to the contrary) never purchased any goods or services from it."[47] Contrary to Esposito's contention that payment is required, the Second Circuit recognized in *Abbar* that a "simple, predictable, and suitably broad definition" of "customer" is necessary,[48] and that a "customer" includes one who "undertakes to purchase a good or service from a FINRA member."[49]

In *Morgan Keegan*, the alleged customers purchased bond funds underwritten by Morgan Keegan from a third party through their own broker, who was not affiliated with Morgan Keegan.[50] They filed a FINRA arbitration proceeding against Morgan Keegan for alleged

---

[46] *Id.*.

[47] *Id.*

[48] *Id.* at 276.

[49] *Id.* (quoting *W. Va. Univ. Hosps.*, 660 F.3d at 650).

[50] *Morgan Keegan & Co. v. Silverman*, 706 F.3d 562, 564 (4th Cir. 2013).

securities fraud regarding the bond funds.[51] The Fourth Circuit concluded the investors were not customers of Morgan Keegan because they "did not have a contractual relationship with Morgan Keegan, and did not purchase from Morgan Keegan services or commodities, related to investment banking or the securities business.[52]

Unlike those cases, Nemaha entered into a contract with Esposito to purchase its services for a fee. The basis of this dispute is Esposito's claim that it provided those services to Nemaha and Nemaha refused to pay for them. By "undertaking to purchase" those services directly from Esposito for a fee, Nemaha became a customer.[53]

Esposito also contends no case has decided the customer status solely from the face of an agreement, but the Second Circuit did just that in *West Virginia University Hospitals, Inc*.[54] The court noted that the agreements between the parties reflected an undertaking by WVUH to pay UBS a fee for its services and concluded, "In view of that undertaking and a definition of customer that at least includes an entity that undertakes to purchase a good or service, WVUH became UBS's customer under Rule 12200 by contracting with UBS to obtain auction services for a fee."[55]

We conclude the Agreement represents an undertaking by Nemaha to purchase financial services from Esposito for a fee. Because the definition of customer "at least includes an entity that undertakes to purchase a good or service"[56] from a FINRA member, Nemaha became

---

[51] *Id.*

[52] *Id.* at 567, 568; *See also Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386–87 (4th Cir. 2013) (investors were not customers under rule 12200 where there was no evidence of a contractual relationship with member regarding the transaction).

[53] *See Abbar*, 761 F.3d at 275; *W. Va. Univ. Hosps.*, 660 F.3d at 650.

[54] *W. Va. Univ. Hosps.*, 660 F.3d at 650.

[55] *Id.*; *see also Abbar*, 761 F.3d at 276 (citing *W. Va. Univ. Hosps.*, 660 F.3d at 650 as noting that a customer may also be one who "undertakes to purchase[] a good or service from a FINRA member").

[56] *W. Va. Univ. Hosps.*, 660 F.3d at 650.

Esposito's customer under rule 12200. The trial court abused its discretion by finding Nemaha was not a customer.

Esposito next argues that the obligation to arbitrate under FINRA Rule 12200 can be superseded by a contract. Indeed, there is authority for this proposition.[57] However, in light of the recital in the trial court's order that FINRA arbitration is required if Nemaha is a customer, we need not decide whether the Agreement supersedes the customer's right to request arbitration under FINRA rules.

We sustain Nemaha's sole issue.

## CONCLUSION

We conclude Nemaha is a customer of Esposito, a FINRA member, and entitled to request arbitration under FINRA Rule 12200. Accordingly, the trial court erred by denying Nemaha's motion to compel arbitration. We reverse that portion of the trial court's order, render judgment granting Nemaha's motion to compel arbitration, and order all disputes between the parties proceed to arbitration before FINRA pursuant to FINRA rules. We conditionally grant the petition for writ of mandamus as to the portion of the order granting Esposito's motion to compel

---

[57] The Second Circuit has said:

> In particular, as relevant here, "different or additional contractual arrangements for arbitration can supersede the rights conferred on [a] customer by virtue of [a] broker's membership in a self-regulating organization such as [FINRA]." *Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 864 (2d Cir.1994) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 113 (2d Cir.1990)).

*In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 132 (2d Cir. 2011) (alteration in original); *see also Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 214–15 (2d Cir. 2014) (FINRA arbitration rules were superseded by forum selection clauses requiring "all actions and proceedings" to be brought in federal court); *City of Reno*, 747 F.3d at 741 ("As a threshold matter, we agree with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules."); *Carilion Clinic*, 706 F.3d at 328 ("At the outset, we agree with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties."); *Luckie v. Smith Barney, Harris Upham & Co., Inc.*, 999 F.2d 509, 514 (11th Cir. 1993) ("arbitration provisions of a more specific customer agreement can supersede the arbitration provisions of the AMEX Constitution, namely the AMEX Window"); *Roney & Co. v. Goren*, 875 F.2d 1218, 1223 (6th Cir. 1989) (Customer's "decision to sign the customer agreement providing for arbitration solely before the NYSE was not made involuntarily or under any misleading circumstances; therefore the parties, including appellant, are contractually bound to honor their mutual predispute choice of NYSE arbitration.").

arbitration and direct the trial court to vacate that portion of the order. We are confident the district court will comply without delay. The writ will issue only if it fails to do so.

/Craig Stoddart/
CRAIG STODDART
JUSTICE

141223F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL MORFORD D/B/A NEMAHA
WATER SERVICES, GEFFREY ARNOLD
MCFALLS, INDIVIDUALLY D/B/A
NEMAHA WATER SERVICES, NEMAHA
WATER SERVICES, LP, NEMAHA
WATER SERVICES GP, LLC, NEMAHA
WATER SERVICES OK-1702, LLC, AND
NEMAHA SERVICES HOLDING
COMPANY, LLC, Appellants

On Appeal from the 44th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-05795.
Opinion delivered by Justice Stoddart.
Justices Fillmore and Whitehill participating.

No. 05-14-01223-CV          V.

ESPOSITO SECURITIES, LLC, Appellee

        In accordance with this Court's opinion of this date, that portion of the trial court's August 28, 2014 Order Granting Plaintiff's Motion to Compel Arbitration denying appellants' motion to compel arbitration is **REVERSED** and judgment is **RENDERED** that:

        Appellants MICHAEL MORFORD D/B/A NEMAHA WATER SERVICES, GEFFREY ARNOLD MCFALLS, INDIVIDUALLY D/B/A NEMAHA WATER SERVICES, NEMAHA WATER SERVICES, LP, NEMAHA WATER SERVICES GP, LLC, NEMAHA WATER SERVICES OK-1702, LLC, AND NEMAHA SERVICES HOLDING COMPANY, LLC's motion to compel arbitration is **GRANTED** and all disputes between the parties shall proceed to arbitration before FINRA pursuant to FINRA rules.

        It is **ORDERED** that appellants MICHAEL MORFORD D/B/A NEMAHA WATER SERVICES, GEFFREY ARNOLD MCFALLS, INDIVIDUALLY D/B/A NEMAHA WATER SERVICES, NEMAHA WATER SERVICES, LP, NEMAHA WATER SERVICES GP, LLC, NEMAHA WATER SERVICES OK-1702, LLC, AND NEMAHA SERVICES HOLDING COMPANY, LLC recover their costs of this appeal from appellee ESPOSITO SECURITIES, LLC.

Judgment entered this 18th day of September, 2015.